# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA, and the
STATE OF WISCONSIN, ex rel. DR. CLARK
SEARLE,

          Plaintiffs,

      v.                                           Case No. 14-C-0969

AGNESIAN HEALTHCARE, INC., and
FOND DU LAC REGIONAL CLINIC, S.C.,

          Defendants.

## DEFENDANT FOND DU LAC REGIONAL CLINIC, S.C.'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO RELATOR'S FIRST AMENDED COMPLAINT

Fond du Lac Regional Clinic, S.C. ("FDLRC"), by its undersigned attorneys, responds to the Relator's First Amended Complaint (Dkt No. 26) as follows:

1.     This is an action to recover damages and civil penalties on behalf of the United States of America and the State of Wisconsin arising from false and/or fraudulent records, statements, and claims made and caused to be made by Defendants and/or their agents and employees in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*., and the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 (repealed July 12, 2015).

**RESPONSE:** FDLRC denies the allegations in Paragraph 1, except that FDLRC admits that Relator purports to bring this action under the referenced statutory provisions.

2.     This *qui tam* case is brought against Defendants for knowingly defrauding the federal Government and the state of Wisconsin, in connection with Medicare, Medicaid, and other government-funded healthcare programs. As alleged below, since 1996, Agnesian has engaged in a scheme to pay improper compensation to physicians to induce them to illegally refer patients to its hospitals and associated medical facilities for medical services paid for by government-funded healthcare programs, including "designated health services" as defined by the Stark Law.

**RESPONSE:** FDLRC denies the allegations in Paragraph 2. Further answering, FDLRC denies that it was party to or involved in a scheme with Agnesian HealthCare, Inc. ("Agnesian"), a religious-sponsored, tax exempt healthcare organization, in violation of the Stark Law, Anti-Kickback Statute or any other laws or statutory provisions relating to the compensation paid under the Professional Services Agreements ("PSAs") at issue in this case. Indeed, the compensation was compliant with all applicable laws and properly intended to support Agnesian's mission and strategic goal of providing community benefit by improving access to health services and providing appropriate healthcare to all members of the community. FDLRC further states that all billings of services relating to FDLRC physicians were proper, appropriate and correctly reimbursable.

3. Agnesian, a three-hospital system in Wisconsin, controls approximately 60-70% of the healthcare market in the Fond du Lac region. This market dominance is largely driven by Agnesian's vast network of affiliated physicians, all of whom are pressured to, and almost exclusively do, refer internally to Agnesian physicians and facilities. Agnesian has put significant effort and resources into expanding its network of affiliated physicians so as to control their referral streams and maintain market dominance.

**RESPONSE:** FDLRC admits that Agnesian is a religious-sponsored and integrated healthcare system located in Fond du Lac, Wisconsin and that Agnesian serves the Fond du Lac area including rural and underserved communities. FDLRC is without sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 3, and, therefore, denies them. FDLRC affirmatively states it works with Agnesian to attract and retain board certified physicians in the communities served by FDLRC and Agnesian in order to maintain the availability and continuity of medical care for patients over a challenging period with rapidly evolving healthcare financing and delivery trends.

4. To acquire these affiliations, Agnesian knowingly and willfully made, and continues to make, illegal and improper payments to the physicians employed through its affiliated physician group to ensure that they refer all, or substantially all, of their patients to Agnesian rather than a competitor. Such payments, and Agnesian's subsequent submission of

2

claims related to these illegally referred patients, violate the Anti-Kickback Statute, the Stark Law, and the False Claims Act.

**RESPONSE:** FDLRC denies the allegations in Paragraph 4.

5.      As alleged in greater detail below, from at least 1996 through 2015, Agnesian's illegal physician payments were comprised of several elements.  First, when calculating each physician's cash compensation, Agnesian factored in a "Department Adjustor" or "DA," designed to reflect the value of that physician's specialty's referrals to Agnesian hospitals, facilities, services, and other Agnesian physicians.  Second, when calculating physician compensation, Agnesian over-valued physician services and regularly credited physicians with a portion of the fees earned by Agnesian facilities for services performed by Agnesian.  A third and continuing component of Agnesian's overcompensation is the use of "deferred compensation" payments tied to an expansive agreement limiting the physician's ability to refer patients to Agnesian's competitors should he or she leave Agnesian.  Fourth, Agnesian also routinely cuts side-deals, giving high-referring physicians additional compensation or other valuable consideration above and beyond the basic compensation model.

**RESPONSE:** FDLRC denies the allegations in Paragraph 5.

6.      Beginning in 2016, the method, but not the fact, of Agnesian's physician overcompensation changed.  Defendants painstakingly constructed a revised compensation methodology that on its face appears to reward physicians based on quality and productivity.  In fact, the compensation rates and methodology were backed into with Defendants' primary motivator being maintaining the physicians' existing compensation; *i.e.*, "keeping the doctors whole."  In this way, Defendants continue to over-compensate physicians and reward high-referring physicians to maintain their continuing referrals.

**RESPONSE:** FDLRC admits only that the manner in which physician compensation was determined under the underlying PSAs changed over time.  FDLRC denies all remaining allegations in Paragraph 6.  Further answering, FDLRC avers that the PSAs were legal in all respects.

7.      Taken together, Agnesian's payments to many of its physicians are above fair market value and commercially unreasonable (absent consideration of those physicians' referrals).  These overpayments are made to ensure that the physicians refer all, or substantially all, of their patients to Agnesian hospitals, facilities, services, and physicians.

**RESPONSE:** FDLRC denies the allegations in Paragraph 7.

8.      Federal law, specifically the Stark Law (42 U.S.C. § 1395nn) and Anti-Kickback Statute (42 U.S.C. § 1320a-7b), prohibit hospitals and other medical providers from paying physicians in exchange for referring them business paid for by government-funded healthcare programs.  Moreover, all claims submitted to Medicare, Medicaid, or other government-funded

healthcare programs, for services provided pursuant to referrals from physicians with whom the billing provider has improper financial relationships, are false within the meaning of the federal False Claims Act.

**RESPONSE:** Paragraph 8 contains allegations of law relating to a partially referenced and characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

9.      Through the acts described above, and in greater detail below, Defendants have submitted and caused to be submitted tens of thousands of fraudulent claims to federal and state-funded healthcare programs for services provided pursuant to kickback-tainted referrals and/or based on referrals from physicians with whom Defendants had financial relationships not falling within a Stark safe harbor. Each submission is a false or fraudulent claim in violation of the federal and Wisconsin False Claims Acts.

**RESPONSE:** FDLRC denies the allegations in Paragraph 9. Further answering, FDLRC denies that payments made to physicians were in violation of any law, that it submitted or caused any improper claim to be submitted, or that FDLRC or Agnesian or any other party engaged in wrongdoing or fraud, or acted with intent to defraud the Government.

10.      The federal False Claims Act (the "FCA") was originally enacted during the Civil War. Congress substantially amended the Act in 1986 — and, again, in 2009 and 2010 — to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it. The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

**RESPONSE:** Paragraph 10 contains allegations of law relating to a partially characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

11.      The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (c) conspiring to knowingly present or cause to be presented to the federal government a false or fraudulent claim for payment or approval; and (d) knowingly making, using, or causing to be made or used, a false record or statement material

4

to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. 31 U.S.C. §§ 3729(a)(1)(A)-(C), and (G). Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation committed on November 2, 2015 or before (and up to $21,563 for each violation committed after November 2, 2015), plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1).

**RESPONSE:** Paragraph 11 contains allegations of law relating to a partially referenced

and characterized statute to which no response is required; to the extent a response is deemed

necessary, FDLRC denies same.

12.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

**RESPONSE:** Paragraph 12 contains allegations of law relating to a partially referenced

and characterized statute to which no response is required; to the extent a response is deemed

necessary, FDLRC denies same.

13.     The Wisconsin False Claims for Medical Assistance Law prohibits similar conduct as that prohibited by the Federal FCA, allows plaintiffs to bring an action on the State's behalf with respect to false claims made before July 12, 2015, and provides analogous remedies to those provided in the Federal FCA. As set forth below, Defendants' actions alleged in this Complaint also constitute violations of the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 (repealed July 12, 2015).

**RESPONSE:** Paragraph 13 contains allegations of law relating to a partially referenced

and characterized statute to which no response is required; to the extent a response is deemed

necessary, FDLRC denies same.

14.     Based on the foregoing laws, *qui tam* plaintiff Dr. Clark Searle seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendants made or caused to be made by seeking payment from government-funded healthcare programs for services performed pursuant to referrals from physicians who were financially incentivized to align themselves with Defendants and refer internally for Defendants' benefit.

5

**RESPONSE:** FDLRC admits that Relator Searle filed an amended complaint on July 14, 2017 and seeks recovery as a "*qui tam* plaintiff," but denies all remaining allegations in Paragraph 14.

15.    Plaintiff-Relator Dr. Clark Searle is an orthopedic surgeon and resident of Fond du Lac, Wisconsin.  Dr. Searle was recruited to practice at Defendant Fond du Lac Regional Clinic in 2006.  In 2008, Dr. Searle was made a "shareholder" of the Fond du Lac Regional Clinic.  Dr. Searle has served in several Clinic leadership roles.  From 2010 through 2013, he was on the Clinic Board of Directors.  Between 2008 and 2011, and from 2013 until approximately April 2015 when Relator began being excluded from meetings, he was a member of the Clinic Professional Services Agreement ("PSA") Committee.  And in 2013 he served on the Clinic Compensation Committee.  Dr. Searle's last day of employment by the Fond du Lac Regional Clinic was July 3, 2017.

**RESPONSE:** FDLRC admits that Relator is an orthopedic surgeon and that, upon information and belief, he is a resident of Fond du Lac, Wisconsin. FDLRC also admits that Relator was employed by FDLRC from 2006 until July 3, 2017, and that he held various FDLRC leadership roles during the term of his employment. FDLRC denies all remaining allegations in Paragraph 15.

16.    During his employment, Dr. Searle repeatedly raised concerns about, and attempted to reform, the improper compensation arrangements detailed below.  For example, at a March 5, 2014 meeting of the Clinic's PSA Committee, attended by among others, Dr. Derek Colmenares, Chief Medical Officer of Agnesian HealthCare, and Dr. Mary Schultz, the immediate past Clinic President, Dr. Searle stated explicitly that "The [Department Adjustment Factor] is illegal and is a clear Stark violation." On March 17, 2014, at an FDLRC Shareholder meeting, Dr. Searle again stated his belief that the physician compensation plan violated relevant regulations.  At another PSA meeting held on December 8, 2014, frustrated by the lack of movement towards a revised compensation plan, Dr. Searle stated, "The problem is we have a non-compliant plan now, and we are nowhere close to having a compliant plan after 18 months."

**RESPONSE:** FDLRC admits only that Relator was a shareholder of FDLRC, that FDLRC has had various PSAs with Agnesian, and that the FDLRC shareholders reviewed and discussed said compensation arrangements in various meetings, including meetings of the PSA Committee. FDLRC denies all remaining allegations in Paragraph 16. Further answering,

FDLRC denies that the compensation arrangements or payments made to physicians were improper in any manner or in violation of any applicable law.

17.     Defendant Agnesian HealthCare ("AHC") is a non-profit, three-hospital health system based in Fond du Lac, Wisconsin. Its principal office is located at 430 E. Division St., Fond du Lac, Wisconsin. The largest hospital, St. Agnes, is located in Fond du Lac and has approximately 100 inpatient beds. St. Agnes' patient mix is made up of approximately 40% Medicare and Medicaid patients. AHC's two other hospitals are located in Ripon and Waupun, Wisconsin. AHC also includes over a dozen clinics staffed by the physicians employed by Defendant Fond du Lac Regional Clinic.

**RESPONSE:** FDLRC admits the allegations in Paragraph 17.

18.     Although AHC is a non-profit entity, and therefore does not technically realize profits, its year end "revenues minus expenses" is the functional equivalent of profit. These "profits" have risen significantly over the last few years, going from $7.62 million in 2009 to $24.2 million in 2012.

**RESPONSE:** FDLRC admits only that Agnesian is a religious-sponsored, tax-exempt healthcare organization with a mission and strategic goal of providing community benefit by improving access to health services and providing appropriate healthcare to all members of the community. FDLRC denies the allegation that non-profit entities "profit," and is without sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 18, and, therefore, denies them.

19.     Defendant Fond du Lac Regional Clinic, S.C. (the "Clinic" or "FDLRC") is a for-profit Wisconsin service corporation. Its principal office is located at 420 E. Division St., Fond du Lac, Wisconsin. It is a multi-specialty physician group of about 100 physicians. Since 1996, it has had a PSA with Agnesian HealthCare under which it provides physician services exclusively for Agnesian. In exchange, Agnesian pays all of the Clinic's expenses including physician salaries as well as all overhead costs.

**RESPONSE:** FDLRC admits the first three sentences in Paragraph 19 and that it has had various PSAs with Agnesian since 1996. FDLRC denies all remaining allegations in Paragraph 19.

20.     The operations and management of AHC and the Clinic are closely intertwined. First, FDLRC and AHC have overlapping leadership. Under the PSA, three Clinic physician-employees sit on the Agnesian Board of Directors. AHC's CEO and CFO attend all Clinic

Board of Directors meetings. All significant decisions by the Clinic Board or Committees, such as decisions to raise physician compensation, provide compensation guarantees, or hire or fire physicians, are cleared first with AHC's CEO, Steve Little.

**RESPONSE:** FDLRC admits only that three FDLRC physicians sit on the Agnesian

Board of Directors and that Agnesian's CEO and CFO attend all FDLRC Board of Directors

meetings. FDLRC denies all remaining allegations in Paragraph 20.

21. In addition, almost all Clinic administrative functions are performed by AHC employees. For example, the Clinic's billing is performed by Agnesian employees, and the Clinic's Administrator is an employee of AHC. In fact, the Clinic has only a single non-physician employee, its accountant, Kate Cole, and even her salary is paid by AHC.

**RESPONSE:** FDLRC admits that Kate Cole is an accountant and FDLRC's

Comptroller, and denies all remaining allegations in Paragraph 21.

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. In addition, 31 U.S.C. § 3732(b) vests this Court with jurisdiction over the state law claims asserted in this Complaint.

**RESPONSE:** FDLRC admits that this Court has jurisdiction over this matter.

23. Under 31 U.S.C. § 3730(e), and the analogous provisions of Wisconsin's False Claims Act, there has been no statutorily relevant prior public disclosure of the "allegations or transactions" in this Complaint. Even if there had been any such public disclosure, Relator is the "original source" of the allegations herein, within the meaning of 31 U.S.C. § 3730(e)(4)(B), because he has direct and independent knowledge of the information that forms the basis of this complaint, which materially adds to any such public disclosure, and he voluntarily disclosed that information to the Government and the State before filing this action.

**RESPONSE:** FDLRC denies the allegations in Paragraph 23.

24. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States. Moreover, Defendants can be found in and have transacted business in the Eastern District of Wisconsin.

**RESPONSE:** FDLRC admits that this Court has personal jurisdiction over FDLRC in

this matter.

25.     Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) 31 U.S.C. § 3732(a) because Defendants can be found in and transact or have transacted business in this district.  At all times relevant to this Complaint, Defendants regularly conducted, and continue to conduct, substantial business within this district and/or maintain employees and offices in this district.

**RESPONSE:** FDLRC admits the allegations in Paragraph 25.

26.     Medicare is a federally-funded health insurance program which provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from end-stage renal disease.  The program was established in 1965 under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*.  The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

**RESPONSE:** Paragraph 26 contains allegations of law relating to partially referenced

and characterized statutes to which no response is required; to the extent a response is deemed

necessary, FDLRC admits same.

27.     The Medicare program has four parts: Part A, Part B, Part C and Part D. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of hospital services and post-hospital nursing facility care.  Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, such as services provided to Medicare patients by physicians, laboratories, and diagnostic testing facilities.  *See* 42 U.S.C. §§ 1395k, 13951, 1395x(s).  Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

**RESPONSE:** Paragraph 27 contains allegations of law relating to partially referenced

and characterized statutes to which no response is required; to the extent a response is deemed

necessary, FDLRC admits same.

MIL-29184473-1

28. To administer Parts A and B of the Medicare program, private insurance companies act as agents of the Department of Health and Human Services, making payments on behalf of the program beneficiaries and providing other administrative services. 42 U.S.C. §§ 1395h and 1395u. These companies are called "carriers." 42 C.F.R. § 421.5(c). Through local carriers, Medicare establishes and publishes the criteria for determining what services are eligible for reimbursement or coverage. This information is made available to the providers who seek reimbursement from Medicare.

**RESPONSE:** Paragraph 28 contains allegations of law relating to partially referenced and characterized statutes and regulations to which no response is required; to the extent a response is deemed necessary, FDLRC admits same.

29. National Government Services is currently the local carrier under contract with CMS to administer Part A and Part B claims in Wisconsin.

**RESPONSE:** FDLRC admits the allegations in Paragraph 29.

30. Medicare reimburses health care providers for the costs of providing covered health services to Medicare beneficiaries. *See* 42 U.S.C. § 1395x(v)(1)(A). In order to bill Medicare Part A, a provider must submit an electronic or hard-copy claim form called the UB-04 (also known as the CMS 1450) to the appropriate Medicare carrier. To bill Medicare Part B, a provider must submit an electronic or hard-copy claim form called the CMS 1500 (formerly known as HCFA 1500) to the appropriate Medicare carrier. These forms describe, among other things, the provider, the patient, the referring physician, the service(s) provided by procedure code, the related diagnosis code(s), the dates of service, and the amount charged. The provider certifies on the CMS 1500 claim form that the information provided is truthful and that the services billed on the form were "medically indicated and necessary." The provider certifies in the UB-04 that "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate, and complete."

**RESPONSE:** Paragraph 30 contains allegations of law relating to a partially referenced and characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

31. In addition, each Medicare provider must sign a provider agreement, and by so doing must agree to comply with all Medicare requirements including the fraud and abuse provisions. A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.

**RESPONSE:** Paragraph 31 contains allegations of law relating to a partially referenced and characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

32.     At all times relevant to this action, the local carriers that reviewed and approved the claims at issue in this case based their review upon the enrollment information and claim information provided by the Defendants, and relied on the veracity of that information in determining whether to pay the claims submitted by Defendants.

**RESPONSE:** FDLRC is without sufficient knowledge or information to admit or deny the allegations in Paragraph 32, and, therefore, denies them.

33.     As a prerequisite to payment, Medicare also requires hospitals to submit annually a Form CMS-2552 (previously form HCFA-2552), more commonly known as the Hospital Cost Report.  Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

**RESPONSE:** Paragraph 33 contains allegations of law relating to partially referenced and characterized Medicare program requirements to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

34.     Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.  Through this certification, the provider confirms that the cost report is "true, correct and complete" and that the services identified in the cost report "were provided in compliance with [the laws and regulations regarding the provision of the health care services]." The certification also states, *inter alia*: "if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result."

**RESPONSE:** Paragraph 34 contains allegations of law relating to a partially referenced and characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

MIL-29184473-1

35.     "Traditional Medicare" (Parts A and B) operates on a "fee-for-service" basis, meaning that Medicare directly pays hospitals, physicians, and other health care providers for each service they provide to a Medicare beneficiary.

**RESPONSE:** Paragraph 35 contains allegations of law relating to partially characterized statutes to which no response is necessary; to the extent a response is deemed necessary, FDLRC admits same.

36.     In 1997, Congress created Medicare Part C, which provides similar benefits to Medicare members, but does so based on a managed care model, rather than the traditional fee-for-service model.  Under Part C, rather than pay providers directly, Medicare pays private managed care plans (later named "Medicare Advantage" or "MA" plans) a capitation rate (per member per month) and those plans are responsible for paying providers for the services they provide to members of that specific MA plan.  The monthly capitation rate is based on the beneficiary's geographic location, income status, gender, age, and health status.

**RESPONSE:** Paragraph 36 contains allegations of law relating to partially characterized statutes to which no response is necessary; to the extent a response is deemed necessary, FDLRC admits same.

37.     In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act, creating Medicare Part D which provides prescription drug coverage. Although a limited number of Medicare Part D plans are operated under a cost-reimbursement contract, the plans are generally financed under a managed care model.  These managed care model plans are provided under both Part D prescription drug plans, which offer only prescription drug coverage, and Part C plans, which integrate the prescription drug coverage with the Part C health care coverage.

**RESPONSE:** Paragraph 37 contains allegations of law relating to partially characterized statutes to which no response is necessary; to the extent a response is deemed necessary, FDLRC admits same.

38.     Herein, Medicare Advantage plans with and without Part D coverage, and stand-alone managed care Medicare Part D Plans are referred to as "Medicare Advantage Plans" or "MA Plans."

**RESPONSE:** FDLRC admits only that the Complaint uses the terms referenced in Paragraph 38. To the extent that Paragraph 38 makes additional allegations, they are denied.

39. Medicare covers hospital inpatient and outpatient care. Since 1983, Medicare, Medicaid, and other federally-funded health insurance programs have reimbursed hospitals for inpatient care through a prospective payment system based on classification of patients through Diagnosis Related Groups (DRGs). DRGs are groups of clinically similar diagnoses and/or procedure codes, which are presumed to have similar resource utilization. Medicare pays a fixed amount per case by DRG.

**RESPONSE:** Paragraph 39 contains allegations of law relating to partially characterized statutes to which no response is necessary; to the extent a response is deemed necessary, FDLRC admits same.

40. Payments for outpatient hospital services are also based on bundled, per-case payment system. Hospitals use Ambulatory Payment Classification ("APC") codes to bill for costs associated with outpatient services. Similar to the DRG-based payment system for inpatient services, Medicare reimburses hospitals for outpatient services through standardized payments determined by the APC to which the claim is assigned.

**RESPONSE:** Paragraph 40 contains allegations of law relating to partially characterized statutes to which no response is necessary; to the extent a response is deemed necessary, FDLRC admits same.

41. Each claim is assigned one or more APCs based on the procedure codes (*i.e.*, HCPCS code, as described below) included on the claim form. Unlike inpatient DRG payments, where the hospital generally receives only one DRG payment per case, hospitals can receive multiple APC payments for the same outpatient case, depending on the nature of the services provided.

**RESPONSE:** Paragraph 41 contains allegations of law relating to partially characterized statutes to which no response is necessary; to the extent a response is deemed necessary, FDLRC admits same.

42. Physician services provided to either inpatients or outpatients are billed and reimbursed separately from the hospital's DRG or APC-based payment. Physician services are reimbursed through a payment system based on the Healthcare Common Procedure Coding System ("HCPCS"). HCPCS is a standardized coding system that groups procedures based on the level of professional effort required to render the service. Medicare pays physicians a fixed "global" amount for their services when they are performed in a physician's office. This payment includes both a "professional" component to compensate for the physician's services and a "technical" component to compensate for the cost of office space, supplies, etc.

MIL-29184473-1

**RESPONSE:** Paragraph 42 contains allegations of law relating to partially characterized statutes to which no response is necessary; to the extent a response is deemed necessary, FDLRC admits same.

43.     When a physician performs services in a hospital setting (either inpatient or outpatient), Medicare pays the physician a "professional" fee, but does not pay the physician the "technical" component.  Instead, the hospital is reimbursed for these costs through the DRG or APC payment.

**RESPONSE:** Paragraph 43 contains allegations of law relating to partially characterized statutes to which no response is necessary; to the extent a response is deemed necessary, FDLRC admits same.

44.     Medicaid is a public assistance program providing for payment of medical expenses for low-income and disabled patients.  Medicaid was created in 1965 under Title XIX of the Social Security Act, 42. U.S.C. § 1396 *et seq*.  Funding for Medicaid is shared between the Federal Government and those states participating in the program.

**RESPONSE:** Paragraph 44 contains allegations of law relating to partially characterized statutes to which no response is necessary; to the extent a response is deemed necessary, FDLRC admits same.

45.     Federal regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of HHS ("the Secretary").  Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  Federal statutes and regulations restrict the items and services for which the federal government will pay through its funding of state Medicaid programs.

**RESPONSE:** Paragraph 45 contains allegations of law relating to a partially referenced and characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC admits same.

46.     Each provider that participates in the Wisconsin Medical Assistance program must sign a provider agreement with the State.  Wis. Admin. Code DHS § 105.01 (3)(e).  In addition, Wisconsin regulations provide that a physician can only be reimbursed for services that are "appropriate and medically necessary," Wis. Admin. Code DHS § 106.02(5), and only when

14

they are provided in compliance with "applicable federal and state procedural requirements." Wis. Admin. Code DHS § 106.02(4).

**RESPONSE:** Paragraph 46 contains allegations of law relating to partially referenced and characterized regulations to which no response is required; to the extent a response is deemed necessary, FDLRC denies same. Further answering, FDLRC states that all services provided by physicians were appropriate, medically necessary and properly reimbursable based on compliance with all applicable laws.

47. The Federal Government administers other health care programs including, but not limited to, TRICARE/CHAMPUS, CHAMPVA, and federal workers' compensation programs.

**RESPONSE:** FDLRC admits the allegation in Paragraph 47.

48. TRICARE/CHAMPUS, administered by the United States Department of Defense is a health care program for individuals and dependents affiliated with the armed forces. 10 U.S.C. § 1071 *et seq*.; 32 C.F.R. § 199.4(a).

**RESPONSE:** Paragraph 48 contains allegations of law relating to partially characterized statutes and regulations to which no response is necessary; to the extent a response is deemed necessary, FDLRC admits same.

49. CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability. 38 U.S.C. § 1781 *et seq*.; 38 C.F.R. § 17.270(a).

**RESPONSE:** Paragraph 49 contains allegations of law relating to partially characterized statutes and regulations to which no response is necessary; to the extent a response is deemed necessary, FDLRC admits same.

50. The Federal Employees' Compensation Act provides workers' compensation coverage, including coverage of medical care received as a result of a workplace injury, to federal and postal employees. The Act is administered by the Department of Labor, Division of Federal Employees' Compensation. 5 U.S.C. § 8101 *et seq*.; 20 C.F.R. § 10.0 *et seq*.

15

**RESPONSE:** Paragraph 50 contains allegations of law relating to partially characterized statutes and regulations to which no response is necessary; to the extent a response is deemed necessary, FDLRC admits same.

51.     Wisconsin provides health care benefits to certain individuals, based either on the person's financial need, employment status, or other factors.  To the extent those programs are covered by Wisconsin's False Claims Act, those programs are referred to in this Complaint as "state-funded health care programs."

**RESPONSE:** FDLRC admits only that the Complaint uses the term "state-funded healthcare programs." All other remaining allegations in paragraph 51 are allegations of law relating to a partially referenced statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same..

52.     The Physician Self-Referral Law, commonly referred to as the "Stark Law," and codified at Section 1395nn of title 42, prohibits a hospital (or other entity providing healthcare items or services) from submitting claims to Medicare or Medicaid (including to managed care providers) for payment for services referred from physicians with whom the hospital has a "financial relationship" (as defined in the statute) that does not fall within a safe harbor.  *See* 42 U.S.C. § 1396b(s).

**RESPONSE:** Paragraph 52 contains allegations of law relating to a partially referenced and characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

53.     In enacting the statute, Congress found that financial relationships between physicians and entities to which they refer patients can compromise the physician's professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality.  Congress relied on various academic studies consistently showing that physicians who had financial relationships with medical service providers used more of those providers' services than similarly situated physicians who did not have such relationships.  The statute was designed specifically to reduce the loss suffered by the Medicare program due to such increased questionable utilization of services.

**RESPONSE:** Paragraph 53 contains allegations of law relating to partially referenced and characterized findings to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

54. Congress enacted the Stark Law in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, Pub. Law 101-239, § 6204.

**RESPONSE:** Paragraph 54 contains allegations of law relating to partially referenced

and characterized statutes to which no response is required; to the extent a response is deemed

necessary, FDLRC denies same.

55. In 1993, Congress amended the Stark Law (Stark II) to cover referrals for additional designated health services. *See* Omnibus Budget Reconciliation Act of 1993, Pub. Law 103-66, § 13562, Social Security Act Amendments of 1994, Pub. Law 103-432, § 152. Currently, the Stark Law applies to patient referrals by physicians with a prohibited financial relationship for the following twelve "designated health services" (DHS): (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; (10) home health services, (11) clinical laboratory services, and (12) outpatient speech-language pathology services. *See* 42 U.S.C. § 1395nn(h)(6).

**RESPONSE:** Paragraph 55 contains allegations of law relating to a partially referenced

and characterized statute to which no response is required; to the extent a response is deemed

necessary, FDLRC denies same.

56. In pertinent part, the Stark Law provides:

"(a)    Prohibition of certain referrals

(1) In general. Except as provided in subsection (b), if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then — (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made [by Medicare or Medicaid]; and (B) the entity may not present or cause to be presented a claim under this title or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under (A)."

42 U.S.C. § 1395nn(a)(1) (emphasis added).

**RESPONSE:** Paragraph 56 contains allegations of law relating to a partially referenced and characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

57. Therefore, a physician is prohibited from making referrals to an entity with which he or she has a financial relationship for DHS payable by Medicare or Medicaid. In addition, providers may not bill Medicare or Medicaid for DHS furnished as a result of a prohibited referral.

**RESPONSE:** Paragraph 57 contains allegations of law relating to partially characterized statutes to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

58. Further, no payment may be made by the Medicare or Medicaid programs for DHS provided in violation of 42 U.S.C. § 1395nn(a)(1). *See* 42 U.S.C. §§ 1395nn(g)(1); 1396b(s).

**RESPONSE:** Paragraph 58 contains allegations of law relating to partially referenced and characterized statutes to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

59. Finally, if a person collects payments billed in violation of 42 U.S.C. § 1395nn(a)(1), that person must refund those payments on a "timely basis," defined by regulation not to exceed 60 days. *See* 42 U.S.C. § 1395nn(g)(2); 42 C.F.R. § 411.353(d); 42 C.F.R. § 1003.101.

**RESPONSE:** Paragraph 59 contains allegations of law relating to partially referenced and characterized statutes and regulations to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

60. The Stark Statute broadly defines prohibited financial relationships to include any "direct or indirect compensation arrangement ... with an entity that furnishes DHS." 42 C.F.R. § 411.354(a)(1). An entity is defined to "furnish" DHS if it performs or bills for the service. 42 C.F.R. § 411.351. The statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions.

MIL-29184473-1

**RESPONSE:** Paragraph 60 contains allegations of law relating to partially referenced and characterized regulations to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

61.     A "direct financial arrangement" exists when remuneration passes between the referring physician and the entity furnishing the DHS "without any intervening persons or entities." 42 C.F.R. § 411.354(a)(2).

**RESPONSE:** Paragraph 61 contains allegations of law relating to a partially referenced and characterized regulation to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

62.     An indirect compensation arrangement exists when: 1) an unbroken chain of persons or entities with financial relationships between them links the referring physician to the entity furnishing DHS; 2) the referring physician receives aggregate compensation from the entity with which the physician has a direct financial relationship that varies with, or otherwise takes into account, the volume or value of referrals or other business generated by the physician for the entity furnishing the DHS; and 3) the entity furnishing the DHS has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician receives compensation that so varies. 42 C.F.R. § 41 L354(c)(2).

**RESPONSE:** Paragraph 62 contains allegations of law relating to a partially referenced and characterized regulation to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

63.     There are several safe harbors that a financial relationship may fall into, but the requirements of each must be met precisely.

**RESPONSE:** Paragraph 63 contains allegations of law relating to a partially referenced and characterized regulation to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

64.     For example, compensation paid pursuant to a bona fide employment relationship may be considered proper under the Stark Law, but only if: (1) the employment is for identifiable services; (2) the amount of remuneration under the employment (i) is consistent with the fair market value of the services and (ii) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician; and (3) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer. 42 C.F.R. § 411.357(c).

19

**RESPONSE:** Paragraph 64 contains allegations of law relating to a partially referenced and characterized regulation to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

65.     Similarly, compensation paid pursuant to a personal services arrangement between a hospital and a physician may be considered proper under the Stark Law, but only if: (1) the arrangement is set out in writing, signed by the parties, and specifies the services covered by the arrangement; (2) the arrangement covers all of the services to be provided by the physician to the entity; (3) the aggregate services contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes of the entity of the arrangement; (4) the term of the arrangement is for at least 1 year; (5) the compensation to be paid over the term of the arrangement is to be set in advance, does not exceed the fair market value for the services, is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless the agreement falls within the narrowly defined physician incentive plan); and (6) the services do not involve promoting any activity that violates state or Federal law.  42 C.F.R. § 411.357(d).  Physicians employed by hospitals either as employees or through personal service arrangements may be paid "productivity bonuses," but only if and to the extent that those bonuses are based solely on the value of services personally performed by the physician.  42 C.F.R. § 411.357(c)(4).

**RESPONSE:** Paragraph 65 contains allegations of law relating to a partially referenced and characterized regulation to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.  Further answering, FDLRC avers that the subject PSA arrangements with Agnesian met all applicable federal and state legal requirements and were proper and appropriate in all other respects. Further answering, FDLRC affirmatively alleges that the aggregate compensation paid to physicians was fair market value, commercially reasonable, and compliant with all applicable laws.

66.     A catch-all "fair market value" safe harbor allows entities to compensate physicians with whom they have an arrangement for the provision of items or services, so long as several provisions are met, including that the arrangement is commercially reasonable and the compensation is set in advance, consistent with fair market value, and not determined in a manner that takes into account the volume or value of the physician's referrals.  42 C.F.R. § 411.357(1).

**RESPONSE:** Paragraph 66 contains allegations of law relating to a partially referenced and characterized regulation to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

67. To qualify for the indirect compensation arrangement safe harbor, several elements must be established, including that the compensation received is fair market value for the services actually provided and is not determined "in any manner that takes into account the volume or value of referrals or other business generated" by the referring physician. 42 C.F.R. § 411.357(p).

**RESPONSE:** Paragraph 67 contains allegations of law relating to a partially referenced and characterized regulation to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

68. Fixed aggregate compensation "takes into account" the volume or value of referrals or other business generated by a referring physician when the payment rate is set based on historical or expected referrals. *See United States ex rel. Drakeford v. Tuomey Healthcare Sys.*, 675 F.3d 394, 408 (4th Cir. 2012); *United States ex rel. Singh v. Bradford Reg'l Med. Ctr.*, 752 F. Supp. 2d 602, 631 (W.D. Pa. 2010); 69 Fed. Reg. 16054, 16059 (Mar. 26, 2004) ("It is important to bear in mind that, depending on the circumstances, fixed aggregate compensation can form the basis for a prohibited direct or indirect compensation arrangement. This will be the case if such fixed aggregate compensation takes into account the volume or value of referrals (for example, the fixed compensation exceeds fair market value for the items or services provided or is inflated to reflect the volume or value of a physician's referrals or other business generated).")

**RESPONSE:** Paragraph 68 contains allegations of law relating to partially referenced and characterized precedent to which no response is required; to the extent a response is deemed necessary, FDLRC denies same. Further answering, FDLRC affirmatively alleges that referrals are not considered in any way in the determination of compensation paid to FDLRC physicians.

69. In addition to protecting certain financial arrangements through safe harbors, the Stark Law also exempts certain services from its referral prohibitions. For example, the referral prohibition does not apply to physician services that are performed personally by, or under the supervision of, a member of the referring physician's "group practice." 42 C.F.R. § 411.355(a).

**RESPONSE:** Paragraph 69 contains allegations of law relating to a partially referenced and characterized regulation to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

70.     The referral prohibition also does not apply to "in-office ancillary services." In-office ancillary services ("IOAS") are services (including certain types of DME) that meet very specific requirements.   In general terms, IOAS must be: (1) finished, or supervised, by the referring physician or a member of his/her group practice; (2) furnished in the same building where the referring physician or his/her group practice regularly offers professional services, or in a "centralized building" used by the group practice for the provision of the group practice's DHS; and (3) billed by the physician performing or supervising the service, the group practice of which the performing or supervising physician is a member under a billing number assigned to the group practice, an entity that is wholly owned by the performing or supervising physician or by that physician's group practice, or an independent third billing company acting as an agent of the physician or his/her group practice.  42 C.F.R. § 411.355(b).

**RESPONSE:** Paragraph 70 contains allegations of law relating to a partially referenced and characterized regulation to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

71.     A designated health service is "furnished" for purposes of the IOAS exception in the location where the service is actually performed upon a patient or where an item is dispensed to a patient in a manner that is sufficient to meet the applicable Medicare payment and coverage rules.  42 C.F.R. § 411.355(b)(5).

**RESPONSE:** Paragraph 71 contains allegations of law relating to a partially referenced and characterized regulation to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

72.     A "centralized building" is all or part of a building that is owned or leased on a full-time basis by a group practice and that is used exclusively by the group practice.  42 C.F.R. § 411.351.

**RESPONSE:** Paragraph 72 contains allegations of law relating to a partially referenced and characterized regulation to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

73.     As seen above, the "group practice" definition significantly expands the physician services and in-office ancillary services exceptions. A "group practice," as defined at 42 C.F.R. § 411.352, is a physician practice: (1) that consists of a single legal entity operating primarily for the purpose of being a physician group practice; (2) that has at least two physician members; (3) in which each physician who is a member furnishes substantially the full range of patient care services that the physician routinely furnishes through the joint use of shared office space, facilities, equipment, and personnel; (4) in which at least 75 percent of the total patient care services of the group practice members are furnished through the group, billed under a billing number assigned to the group, and the amounts received are treated as receipts of the group; (4) for which the overhead expenses of, and income from, the practice's services are distributed according to methods that are determined before the receipt of payment for the services giving rise to the overhead expense or producing the income; (5) that is a unified business with a centralized decision-making body that maintains control over the group's assets and liabilities and has consolidated billing, accounting, and financial reporting; and (6) in which no physician who is a member directly or indirectly receives compensation based on the volume or value of his/her referrals except pursuant to the special rule for productivity bonuses and profit shares. 42 C.F.R. § 411.352.

**RESPONSE:** Paragraph 73 contains allegations of law relating to a partially referenced

and characterized regulation to which no response is required; to the extent a response is deemed

necessary, FDLRC denies same.

74.     Pursuant to the special rule for profit shares, a physician in a group practice "may be paid a share of overall profits of the group, provided that the share is not determined in any manner that is directly related to the volume or value of referrals of DHS by the physician." 42 C.F.R. § 411.352(i)(I). In addition, a physician in a group practice "may be paid a productivity bonus based on services that he or she has personally performed, or services 'incident to' such personally performed services, or both, provided that the bonus is not determined in any manner that is directly related to the volume or value of referrals of DHS by the physician." *Id.*

**RESPONSE:** Paragraph 74 contains allegations of law relating to a partially referenced

and characterized regulation to which no response is required; to the extent a response is deemed

necessary, FDLRC denies same. FDLRC affirmatively alleges that referrals are not considered

in any way in the determination of compensation paid to FDLRC physicians.

75.     With respect to a profit share, "[o]verall profits means the group's entire profits derived from DHS payable by Medicare or Medicaid or the profits derived from DHS payable by Medicare or Medicaid of any component of the group practice that consists of at least five physicians." 42 C.F.R. § 411.352(i)(2). Further, overall profits must be divided in a "reasonable and verifiable manner that is not directly related to the volume or value of the physician's referrals of DHS." *Id.* A share of overall profits "will be deemed not to relate directly to the volume or value of referrals" if (1) the group's profits are divided per capita; (2) revenues from

DHS are distributed based on the distribution of the group's revenues attributed to services that are not DHS; or (3) revenues derived from DHS constitute less than 5 percent of the group's total revenues and the allocated portion of those revenues to each physician in the group constitutes 5 percent or less of his/her total compensation from the group. *Id*.

**RESPONSE:** Paragraph 75 contains allegations of law relating to a partially referenced and characterized regulation to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

76. Any productivity bonus paid "must be calculated in a reasonable and verifiable manner that is not directly related to the volume or value of the physician's referrals of DHS." 42 C.F.R. 411.352(i)(3). A productivity bonus "will be deemed not to relate directly to the volume or value of referrals of DHS" if: (1) it is based on the physician's total patient encounters or relative value units; (2) it is based on the allocation of the physician's compensation attributable to services that are not DHS; or (3) revenues derived from DHS are less than 5 percent of the group's total revenues, and the allocated portion of those revenues to each physician in the group practice constitutes 5 percent or less of his or her total compensation from the group practice. *Id.*

**RESPONSE:** Paragraph 76 contains allegations of law relating to a partially referenced and characterized regulation to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

77. Violations of the Stark Law may subject the physician and the billing entity to exclusion from participation in federal health care programs and various financial penalties, including: (a) a civil money penalty of up to $15,000 for each service included in a claim for which the entity knew or should have known that the payment should not be made; and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knows or should have known was prohibited. *See* 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

**RESPONSE:** Paragraph 77 contains allegations of law relating to partially referenced and characterized statutes to which no response is required; to the extent a response is deemed necessary, FDLRC denies same. FDLRC denies that the subject compensation arrangements constituted violations of the Stark Law or any other applicable laws.

78. The Medicare and Medicaid Fraud and Abuse Statute (the "Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1977. The Anti-Kickback Statute arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are

medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

**RESPONSE:** Paragraph 78 contains allegations of law relating to a partially referenced and characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same. Further answering, FDLRC denies that Agnesian and FDLRC entered into an arrangement that violated the Anti-Kickback Statute or any other relevant laws.

79. The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. § 1320a-7b(b). The statute ascribes liability to both sides of an impermissible kickback relationship.

**RESPONSE:** Paragraph 79 contains allegations of law relating to a partially referenced and characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

80. Claims for reimbursement for services that result from kickbacks are false under the False Claims Act. 42 U.S.C. § 1320a-7b(g)

**RESPONSE:** Paragraph 80 contains allegations of law relating to a partially referenced and characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

81. The Anti-Kickback Statute contains statutory exceptions that exempt certain transactions from its prohibitions, such as contracts for employment or personal services.

**RESPONSE:** Paragraph 81 contains allegations of law relating to a partially referenced and characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

82. The personal services safe harbor applies to payments to an agent as long as: (1) the agency agreement is in writing and signed by the parties; (2) the agreement specifies all of the services that the agent is to provide for the principal; (3) if "the agency agreement is intended to provide the services of the agent on a periodic, sporadic, or part-time basis" then the

agreement must specify the intervals and their schedules and charges with specificity; (4) the term of the agreement must be not less than 1 year; (5) the aggregate compensation to the agent must be set in advance, "consistent with fair-market value," and not be determined "in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties;" (6) the services must not involve promotion of any activity that violates state or Federal law; and (7) the aggregate services contracted for must not exceed those reasonably necessary to accomplish the business purpose of the entity. 42 C.F.R. § 1001.952(d). The failure to meet any one of the safe-harbor elements results in the loss of the protection.

**RESPONSE:** Paragraph 82 contains allegations of law relating to a partially referenced

and characterized regulation to which no response is required; to the extent a response is deemed

necessary, FDLRC denies same.

83.     The employment safe harbor applies to all remuneration paid by an employer to a bona fide employee "for employment in the furnishing of any item or service for which payment may be made in whole or in part under" any Federal health care program. 42 C.F.R. § 1001.952(i). This safe harbor provides a defense against Anti-Kickback Statute liability only where a bona fide employee is compensated exclusively for the provision of professional services that are covered by a federal health care program. Any payments to a bona fide employee that are not, in fact, made for the provision of covered professional services do not fall within the safe harbor.

**RESPONSE:** Paragraph 83 contains allegations of law relating to a partially referenced

and characterized regulation to which no response is required; to the extent a response is deemed

necessary, FDLRC denies same.

84.     The act of referring a patient to a hospital or other provider is not a covered item or service. Therefore, any payments made to an employee in order to compensate that employee for making referrals are not covered by the employee safe harbor. This is true even if the majority of an employee's compensation is for the provision of covered services. As to that portion of the payments that is made to induce referrals and to compensate for an employee's act of referring, the Anti-Kickback Statute is violated and the safe harbor does not apply.

**RESPONSE:** Paragraph 84 contains allegations of law relating to a partially referenced

and characterized regulation to which no response is required; to the extent a response is deemed

necessary, FDLRC denies same.

85.     Once the Government has demonstrated each element of a violation of the Anti-Kickback Statute, the burden shifts to the defendant to establish that defendant's conduct at issue was protected by a safe harbor or exception. The Government need not prove as part of its affirmative case that defendant's conduct at issue does not fit within a safe harbor.

**RESPONSE:** Paragraph 85 contains allegations of law relating to a partially referenced and characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

86. Violation of the Anti-Kickback Statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. § 1320a-7(b)(7), 1320a-7a(a)(7).

**RESPONSE:** Paragraph 86 contains allegations of law relating to a partially referenced and characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

87. Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under the Medicare and Medicaid programs.

**RESPONSE:** Paragraph 87 contains allegations of law relating to partially characterized statutes to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

88. Either pursuant to provider agreements, claim forms, or other appropriate manner, hospitals and physicians who participate in a federal health care program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback Statute.

**RESPONSE:** Paragraph 88 contains allegations of law relating to partially characterized regulations to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

89. Any party convicted under the Anti-Kickback Statute must be excluded (*i.e.*, not allowed to bill for services rendered) from federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1). Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agencies to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

**RESPONSE:** Paragraph 89 contains allegations of law relating to a partially referenced and characterized statute to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

90.     The enactment of these various provisions and amendments demonstrates Congress' commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks. Thus, compliance with the Stark and Anti-Kickback Statutes is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare, Medicaid and other federal health care programs.

**RESPONSE:** Paragraph 90 contains allegations of law relating to partially referenced and characterized statutes to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

91.     Between its three hospitals, 14-plus clinics, reference laboratories, and nursing home, Agnesian controls approximately 60-70% of the healthcare market in the Fond du Lac region.

**RESPONSE:** FDLRC is without sufficient knowledge or information to admit or deny the allegations in Paragraph 91, and, therefore, denies them.

92.     Control of the referral streams of the Fond du Lac physicians is crucial to Agnesian because it faces stiff competition from Aurora HealthCare ("Aurora"). Aurora is a significantly larger healthcare network that dominates the southeastern corner of Wisconsin. It has a hospital, surgery center, and several physician offices about 20 miles from Fond du Lac in Oshkosh, Wisconsin. It also has physician office space and a surgery center in Fond du Lac. Over 30 Aurora-employed physicians, nurse practitioners, and physician assistants practice at least part-time at Aurora's Fond du Lac facilities.

**RESPONSE:** FDLRC admits only that Aurora is a healthcare network that aggressively competes with Agnesian. FDLRC is without sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 92 and, therefore, denies them.

93.     On several occasions, physicians who had previously referred patients to Agnesian stopped doing so after they affiliated with Aurora. For example, until about 2 years ago, the Aurora-employed internists in Fond du Lac maintained privileges at St. Agnes and thus admitted patients and provided services there. Around 2012, Aurora informed these physicians that they could not maintain privileges at St. Agnes, effectively halting the flow of referrals from these physicians to Agnesian.

28

**RESPONSE:** FDLRC is without sufficient knowledge or information to admit or deny the allegations in Paragraph 93 and, therefore, denies them.

94.     Similarly, around the beginning of 2014, Aurora hired two general surgeons who had previously had independent practices in Fond du Lac. Previously, these two physicians held privileges, took call, and frequently performed procedures at St. Agnes. Once Aurora hired them, they gave up their privileges at St. Agnes and stopped performing procedures at, or otherwise referring patients to, Agnesian facilities.

**RESPONSE:** FDLRC is without sufficient knowledge or information to admit or deny the allegations in Paragraph 94 and, therefore, denies them.

95.     Defendant Fond du Lac Regional Clinic, a multi-specialty group of approximately 100 physicians, has affiliated exclusively with AHC since 1996. Under the PSA governing their affiliation, the Clinic furnishes the vast majority of physician services required by AHC patients at AHC clinic locations. The Clinic may not contract to provide physician services for any other entity.

**RESPONSE:** FDLRC admits only that FDLRC is a multi-specialty group of approximately 100 physicians and has entered into several PSAs with Agnesian since 1996. FDLRC denies the remaining allegations in Paragraph 95 because Relator fails to specify the PSA to which his allegations relate.

96.     AHC bills and collects for all of the Clinic's services. In exchange, AHC agrees to provide at its "sole cost and expense," "all necessary facilities, services and funding" for the performance of these physician services at AHC facilities, including, but not limited to, office space, furniture, equipment, personnel, supplies, office administrative services, and management information services.

**RESPONSE:** FDLRC admits only that Agnesian bills and collects for all of the FDLRC physicians' services. FDLRC denies the remaining allegations in Paragraph 96 because Relator fails to specify the PSA to which his allegations relate.

97.     Thus, functionally, all Clinic technical fees are actually billed by Agnesian on its own behalf because AHC retains any profit and bears the risk of any loss arising from these services.

**RESPONSE:** FDLRC denies the allegations in Paragraph 97. FDLRC further denies that Agnesian as a non-profit entity generates or retains "profit."

29

98. The Clinic has direct employment arrangements with the individual physicians. Physicians often come on as "associates" and then become "shareholders." Notably though, "shareholders" are owners of the Clinic in name only (*i.e.*, they are not entitled to profit shares, only their salaries and benefits).

**RESPONSE:** Paragraph 98 contains allegations relating to a partial characterization of the clinic Bylaws, Articles of Incorporation, and PSAs, and FDLRC therefore denies same.

99. The clinic-employed physicians are strongly encouraged to maintain privileges at Agnesian's hospitals and may not obtain privileges at Aurora's facilities.

**RESPONSE:** FDLRC admits that its physicians maintain privileges at Agnesian's hospitals further to the terms of the PSAs, and denies the remaining allegations in Paragraph 99.

100. Further, employed physicians are directed to use their "best efforts" to utilize Agnesian facilities and to refer patients to other Agnesian-affiliated physicians. They may refer outside of Agnesian only if the patient requests another facility or physician, the patient's insurance determines the facility or physician the patient will utilize, or in the referring physician's best medical judgment a referral to a non-Agnesian facility is in the patient's best interest. Agnesian tracks "leakage" of referrals outside of the system.

**RESPONSE:** FDLRC is without sufficient knowledge or information to admit or deny the allegation that Agnesian tracks "leakage" of referrals, and, therefore, denies same. The remaining allegations in Paragraph 100 relate to partially characterized portions of PSAs, and FDLRC denies them. Further answering, FDLRC avers that the subject PSA arrangements with Agnesian met all applicable federal and state legal requirements and were proper and appropriate in all other respects.

101. Agnesian keeps approximately 94% of the referrals of its affiliated physicians.

**RESPONSE:** FDLRC is without sufficient knowledge or information to admit or deny the allegations in Paragraph 101 and, therefore, denies them. Further answering, FDLRC affirmatively alleges that it does not track referrals by its physicians and referrals are not considered in any way in the determination of compensation paid to FDLRC physicians.

30

102.     AHC pays annual aggregate compensation to the Clinic to cover the salaries of the Clinic's employed physicians.  This includes payment for cash compensation as well as generous benefit packages.

**RESPONSE:** Paragraph 102 contains allegations relating to partially characterized PSAs, and FDLRC therefore denies same.

103.     As described in further detail below, until 2016, physician cash compensation was calculated in part based on a "Department Adjustment Factor" or "DA" that varied by specialty. Because AHC is responsible for all physician compensation, any adjustments to physician compensation, including increases in a specialty's DA, are borne by AHC unless offset by decreased Clinic costs elsewhere.  For this reason, the Agnesian Physician Compensation Committee and Agnesian Board of Directors had to approve any modifications to the DA.

**RESPONSE:** Paragraph 103 contains allegations relating to partially characterized PSAs, and FDLRC therefore denies same.

104.     The benefits paid to or on behalf of each physician include annually: $6,000 for continuing medical education, approximately $27,250 for health insurance, $1,000 for disability insurance, $1,705 for licenses and medical society dues, $460 for life insurance, at least $3,500 for malpractice insurance, $1,457 for contribution to the Wisconsin State Injured Patient and Families Compensation Fund, and substantial sums to fund the deferred compensation plan described further below.

**RESPONSE:** FDLRC admits only that the referenced categories of benefits are paid to FDLRC physicians. FDLRC denies the remaining allegations in Paragraph 104.

105.     Agnesian knowingly made false claims to Medicare, Medicaid, and other federal and state healthcare programs by submitting claims for services that were tainted by kickbacks and/or were for designated health services referred by physicians with whom Agnesian had a financial relationship that did not fall within a safe harbor.

**RESPONSE:** FDLRC denies the allegations in Paragraph 105.

106.     Agnesian's compensation of the FDLRC physicians violates the Anti-Kickback Statute and results in a financial relationship within the meaning of the Stark Law that does not fall within a safe harbor.  Agnesian pays the FDLRC physicians using a compensation methodology designed to reward them for their referrals to Agnesian facilities and physicians, in violation of the Stark Law and Anti-Kickback Statute.  The payment methodology does this in several ways.

**RESPONSE:** FDLRC denies the allegations in Paragraph 106.

107.     First, until 2016, the physicians' cash compensation was calculated using a "Department Adjustment" factor that rewarded historically high-referring physicians.

**RESPONSE:** FDLRC denies the allegations in Paragraph 107.

108.     Second, Agnesian improperly credited physicians with a portion of the fees earned by its facilities for the provision of services such as maintaining office space, nursing staff, and diagnostic equipment.

**RESPONSE:** FDLRC denies the allegations in Paragraph 108.

109.     Third, Agnesian pays the physicians substantial "deferred compensation" that is tied to the physicians' agreements to continue to work for (and refer patients to) Agnesian, and to refrain from referring patients to Agnesian's competitors should the physicians leave Agnesian.

**RESPONSE:** FDLRC denies the allegations in Paragraph 109.

110.     Finally, Agnesian makes special deals with certain high-referring physicians, offering them additional remuneration above what is available through the standard compensation model.

**RESPONSE:** FDLRC denies the allegations in Paragraph 110.

111.     Beginning in 2016, with the adoption of a new PSA, Agnesian modified its method of compensating FDLRC physicians.     However, the revised methodology was intentionally designed to continue overcompensating Clinic physicians in exchange for their continued referrals to Agnesian's facilities.

**RESPONSE:** FDLRC admits only that in 2016, Agnesian and FDLRC adopted an

Amended and Restated PSA, and denies the remaining allegations in Paragraph 111.

112.     Taken together, the amounts Agnesian pays the FDLRC physicians are commercially unreasonable and above fair market value for the services provided (excluding the value of the physicians' referrals).

**RESPONSE:** FDLRC denies the allegations in Paragraph 112.

113.     All claims submitted by FDLRC or Agnesian for services referred by FDLRC physicians who receive commercially unreasonable, above fair market value compensation, and/or compensation based on the volume and value of their referrals, are false claims within the meaning of the Federal and Wisconsin False Claims Acts.

**RESPONSE:** FDLRC denies the allegations in Paragraph 113.

114.     Until 2016, the base salary for FDLRC physicians was calculated as follows: (1) the physician's "net monthly production;" (2) multiplied by .49; and (3) multiplied by the

32

physician's "Department Adjustment Factor;" and (4) then 30% of billed charges for charity care and bad debt cases handled by the physician is added.

**RESPONSE:** FDLRC denies the allegations in Paragraph 114. Further answering, FDLRC affirmatively alleges that the PSA formula alleged by Relator is incorrect.

115.    The PSA provided that the "Department Adjustment Factor" or "DA" was to be set to "properly reflect market compensation by medical specialties consistent with the services provided in communities comparable to Fond du Lac County."

**RESPONSE:** Paragraph 115 contains allegations relating to a partially characterized and quoted PSA, and FDLRC therefore denies same.

116.    In reality, though, the DA was designed to adjust physician compensation to reflect the value of their historic referrals of ancillary services to the Clinic. When the AHC/FDLRC partnership was formed in 1996, the parties discussed the fact that the physicians could not be paid for their referrals because of the Stark Law. Rather than comply with this directive, to do exactly what the Stark Law (and Anti-Kickback Statute) prohibit, while appearing not to, they devised a way to ensure physicians continued to be compensated for their referrals. Prior to the partnership, the profits the Clinic realized on ancillary services were distributed among the physicians according to how much of the services each physician had ordered. To ensure that physicians "were made whole" when the AHC/FDLRC partnership was formed, each physician was paid a set amount above and beyond his/her base compensation equal to the profits on his/her historical referrals for ancillary services. Over several years, these "bonus" payments became standardized across specialties and became the "DA."

**RESPONSE:** FDLRC denies the allegations in Paragraph 116.

117.    Relator learned this from the Clinic's accountant, Kate Cole, and the Clinic's former administrator, Dennis Yunk, both of whom worked at the Clinic and were involved in the process of setting up the DA.

**RESPONSE:** FDLRC denies the allegations in Paragraph 117.

118.    Moreover, at a March 13, 2014 meeting of the PSA Committee, Agnesian's Medical Director, Dr. Derek Colmenares, stated that "The DA was originally based on internal referrals to Agnesian HealthCare."

**RESPONSE:** FDLRC denies the allegations in Paragraph 118.

119.    Since 1996, the DA has been adjusted several times to perpetuate its improper purpose — *i.e.*, to ensure that high referring specialties are paid more to ensure their continued referrals. Specifically, the Agnesian Board has on several occasions raised the DA to accommodate the demands of physicians who refer substantially to Agnesian physicians and facilities.

**RESPONSE:** FDLRC admits that the DA has been amended since 1996, and denies all remaining allegations in Paragraph 119.

120.    For example, in 2009, the Clinic's primary care physicians asked the Clinic Board to increase their DA.  At the time, there was no evidence that their compensation was low compared to regional or national benchmarks.  In fact, an analysis of their compensation for the prior year conducted by the Medical Group Management Association found that the pay for the Clinic's family practice and internal medicine physicians was between the 80th to 90th percentile of pay for all such physicians, even though their productivity was between the 49th and 64th percentile compared to the benchmarks.  The Pediatricians' pay was in the 67th percentile, even though their productivity was only in the 37th percentile.  Nonetheless, the DA for each of the primary care specialties was increased by 6%.

**RESPONSE:** FDLRC admits only that in and around 2008 the primary care physicians asked for an adjustment to their compensation, and denies the remaining allegations in Paragraph 120.

121.    Originally, the Clinic Board proposed to pay for this increase by reducing the DA for all non-primary care specialties (the "Specialists") by 2%.  The Specialists objected strenuously to this proposal.  Instead, then, the Clinic Board proposed to fund the increase for the primary care physicians by reducing the DA of only a limited number of specialties (Interventional Cardiology, Dermatology, Gastroenterology, Oncology and Otolaryngology) by 6%.  These five targeted specialties again objected.

**RESPONSE:** Paragraph 121 contains allegations relating to partially characterized Clinic Board meeting minutes, and FDLRC therefore denies same.

122.    During these discussions, one prominent specialist encouraged the other Specialists to accept the cut rather than run the risk of losing the referrals from the primary care physicians.  He explained to the other Specialists that he had previously had a dispute with one of the Clinic's pediatricians.  During the course of the dispute, the pediatrician stopped referring patients to him.  He recounted this experience to encourage the specialists to appreciate the risk they faced if they did not keep the primary care physicians happy by increasing their pay.

**RESPONSE:** FDLRC denies the allegations in Paragraph 122.

123.    Ultimately, the five targeted specialties agreed to accept a 4% reduction in their DA.  Agnesian agreed to cover the remaining cost of the salary increase for the primary care physicians, to keep the physicians in the five targeted specialties (which generally perform high-paying procedures at the hospital) happy and to appease the primary care physicians.

**RESPONSE:** FDLRC admits only that an increase in primary care physicians' base compensation was funded in part by Agnesian and in part by reductions in the base compensation of physicians in the following specialties: Interventional Cardiology; Dermatology; Gastroenterology; Oncology; and Otolaryngology. FDLRC denies the remaining allegations in Paragraph 123. Further answering, FDLRC affirmatively alleges that FDLRC routinely addressed changes to physician compensation in accordance with its internal policies and procedures, and that any and all modifications to compensation were commercially reasonable, at fair market value, and in compliance with all applicable laws.

124.    Agnesian's payment of this additional compensation is a kickback to the primary care doctors to induce them to continue referring to Agnesian facilities and the FDLRC physicians who perform procedures at Agnesian. It is also a kickback to the Clinic specialists to induce them to continue referring to, and performing procedures at, Agnesian facilities.

**RESPONSE:** FDLRC denies the allegations in Paragraph 124.

125.    Similarly, in April 2008, the Clinic Compensation Committee discussed a proposal to increase the DA of any physician who stopped performing surgery (and thus, presumably, referred that surgery to another Clinic physician). The proposal was not adopted but an alternate proposal setting the DA of any physician who stopped performing surgeries at 1.256 was adopted. This alternate approach had the same practical effect because a DA of 1.256 is higher than the DA for the specialists who typically perform surgical procedures (e.g., orthopedists whose DA is 1.0817; general surgeons whose DA is 1.1155; interventional cardiologists whose DA was 1.25 in 2008).

**RESPONSE:** Paragraph 125 contains allegations relating to partially characterized Clinic Compensation Committee minutes, and FDLRC therefore denies same. Further answering, FDLRC affirmatively alleges that FDLRC routinely addressed changes to physician compensation in accordance with its internal policies and procedures, and that any and all modifications to compensation were commercially reasonable, at fair market value, and in compliance with all applicable laws.

126.    In another case, around 2004, the FDLRC interventional cardiologists — a specialty that typically performs lucrative procedures at the hospital — demanded the Agnesian

Board increase their DA and threatened to leave if it was not raised. The Board agreed to increase their DA by 6.7%.

**RESPONSE:** FDLRC admits only that the DA of its interventional cardiologist increased in 2004. FDLRC denies the remaining allegations in Paragraph 126. Further answering, FDLRC affirmatively alleges that FDLRC routinely addressed changes to physician compensation in accordance with its internal policies and procedures, and that any and all modifications to compensation were commercially reasonable, at fair market value, and in compliance with all applicable laws.

127. A few years earlier, a high-referring FDLRC gastroenterologist demanded the Agnesian Board raise his DA by threatening to leave if his demands were not met. Again, the Board consented. The DA for gastroenterology was raised by more than 25%, from 1.0743 to 1.351.

**RESPONSE:** FDLRC denies the allegations in Paragraph 127. Further answering, FDLRC affirmatively alleges that FDLRC routinely addressed changes to physician compensation in accordance with its internal policies and procedures, and that any and all modifications to compensation were commercially reasonable, at fair market value, and in compliance with all applicable laws.

128. As demonstrated by the instances recounted above, the DA was used routinely to reward physicians for a broad variety of referrals, including referrals for hospital services and to other physicians. For example, the Clinic physicians refer facility fees to Agnesian's hospitals by performing procedures there, make admissions to Agnesian's hospitals resulting in payments for inpatient treatment, and refer patients to Agnesian for a wide variety of ancillary services including labwork, physical therapy, occupational therapy, speech therapy, imaging, radiation therapy, durable medical equipment, prosthetics and orthotics, home health services, and outpatient drugs. These services do not qualify as in-office ancillary services.

**RESPONSE:** FDLRC denies the allegations in Paragraph 128.

129. These services are not furnished or supervised personally by the referring physician or another member of the Clinic. For example, Clinic physicians regularly order labwork for patients. This labwork is conducted at one of Agnesian's hospitals by a lab run by a hospital-employed pathologist. Likewise, Clinic physicians regularly order physical therapy, occupational therapy, speech therapy, and imaging services. These services are provided at locations operated by Agnesian and the professionals that provide the services are non-Clinic

36

employees of Agnesian. In addition, the services are generally not provided in the same building where the Clinic physicians regularly see patients or in a "centralized building" owned or leased by the Clinic.

**RESPONSE:** FDLRC admits only that its physicians order medically appropriate and necessary labwork for the care of their patients, and denies the remaining allegations in Paragraph 129.

130. There is widespread awareness among the FDLRC physicians that the DA is intended to reward physicians for their internal referrals. For example, in November 2008, the Clinic's two physiatrists unsuccessfully requested an adjustment to their compensation methodology. In arguing for an increase in their DA, they pointed out, "[w]e could argue that our DA is erroneously low as we do order significant patient evaluation testing (MRI's, CT's, x-ray, etc.) and referrals to the procedurists at the surgery center."

**RESPONSE:** FDLRC denies the allegations in Paragraph 130.

131. In 2013, the physiatrists again approached the Committee about an increase in their DA. They again argued that their tests "serve[] as an entry point test for services" and thus they should have a DA in line with that of other departments "working in the same practice base." In other words, because their work leads to significant referrals, their DA should be adjusted to match that of other high-referring specialties (such as family medicine physicians and internists). This time the Committee agreed to guarantee the physicians' 2013 income through 2014 and then revisit the DA issue if the physicians agreed to stay for 2 years.

**RESPONSE:** FDLRC admits only that its physiatrists approached the Compensation Committee in 2013 regarding a compensation increase. FDLRC denies the remaining allegations in Paragraph 131.

132. Specialists that send fewer referrals to their fellow FDLRC physicians and perform few procedures at the hospital have had little luck convincing the Clinic Board to adjust their DAs upwards. For example, around 2010, the Clinic's rheumatologist, Dr. Owens, requested that her DA be increased. Despite the fact that as of 2008 she was one of only two FDLRC physicians paid below the national benchmark median for compensation per wRVU for her specialty, the Clinic refused to increase her DA.[1]

**RESPONSE:** FDLRC denies the allegations in Paragraph 132.

---

[1] A wRVU is a common unit of measurement used to judge the relative effort required for different medical services. It is standard in the industry to assess physician compensation based on total cash compensation and/or total cash compensation per wRVU worked by the physician.

MIL-29184473-1

133.    Until 2016, under the PSA governing FDLRC and AHC's relationship, each physician's "net monthly production" was to equal the amount Agnesian collected from the patients and/or insurers for services <u>personally performed</u> by the physician.

**RESPONSE:** Paragraph 133 contains allegations relating to a partially characterized PSA, and FDLRC therefore denies same.

134.    However, based on his analysis of discrepancies between physician compensation, physician productivity, and reported collections data for various specialties including, *inter alia*, oncology, Relator believes, and on that basis alleges, that Agnesian included, for at least some specialties, services not personally performed by the physician at issue in the "net monthly production" value when calculating the physician's base compensation. Specifically, Relator believes that, in practice, for certain high-referring specialties (e.g., oncology) Agnesian credited physicians with collections for services they didn't perform such as technical fees, facility fees, drugs, or other referrals.

**RESPONSE:** FDLRC denies the allegations in Paragraph 134.

135.    Agnesian's payments to its oncologists are particularly suspect. In Relator's experience, there is consistently a substantially larger discrepancy between their income and productivity than for other FDLRC physicians. Their compensation is routinely above the 80th percentile when compared to regional and national benchmarks, while their productivity is below the 40th percentile. Such a discrepancy is difficult to imagine if their compensation is truly tied to the collections for the work they do. Given this significant discrepancy it is likely that they are receiving credit for the lucrative chemotherapy drugs billed by the hospital and/or the technical fees associated with the work of administrating chemotherapy services.

**RESPONSE:** FDLRC denies the allegations in Paragraph 135.

136.    The Clinic has had at most three oncologists at any one time. Agnesian directly employs several additional radiation oncologists, but they are not members of the Clinic. Therefore, even if the Clinic qualified as a group practice for Stark purposes, and if the chemotherapy administration otherwise qualified as an in-office ancillary service, the Clinic oncologists could not be paid a profit share based on the revenues from these services because there are fewer than five physicians in the sub-group. This is true for most of the Clinic's specialties. The only Clinic physician specialties which have consistently had more than five physicians are family medicine, internal medicine, ob/gyn, and pediatrics.

**RESPONSE:** FDLRC admits only that FDLRC has employed oncologists, and denies all remaining allegations in Paragraph 136.

137.    The discrepancy between oncologist compensation and productivity has made it extremely difficult for Agnesian to revise its compensation methodology while maintaining the compensation of the oncologists at their historic levels. The 2016 PSA, as described in detail below, revised the physician compensation methodology to eliminate the DA and reliance on

38

collections. Instead, compensation is based on the "best fit line" as drawn based on MGMA and SullivanCotter data with increased compensation above this line based on various metrics.[2] However, as described in an October 17, 2014 presentation regarding the new methodology, the oncologists were described as "outliers" whose compensation could not be replicated under the proposed compensation model. The presentation went on to recommend increased compensation for them based on the "value of hospital based infusion therapy."

**RESPONSE:** FDLRC denies the allegations in the first sentence of Paragraph 137. The

remaining allegations in Paragraph 137 relate to a partially characterized PSA and presentation,

and FDLRC therefore denies same.

138.    Moreover, Agnesian goes out of its way to obscure, or outright hide, even basic information about how it calculated the "collections" amount attributable to each physician for purposes of calculating his or her base salary. For example, Relator has repeatedly asked Agnesian for the claims billing and payment detail used to calculate his "collections" amounts. Agnesian has never given him that data. Similarly, Relator has heard numerous other physicians complain that Agnesian will not share such basic information with them.

**RESPONSE:** FDLRC denies the allegations in Paragraph 138.

139.    In response to Relator's questions about general policies and procedures for calculating collections, Agnesian provides limited, vague and/or contradictory information. For instance, many services and procedures, such as x-rays, are billed to Medicare and other providers "globally" — meaning Agnesian submits one bill that covers both the "professional" component (the physician fee) and a "technical" component (meant to cover the clinic or hospital's overhead). Relator has been told by Kate Cole, the Clinic's Accountant, that Agnesian cannot easily split payments made for such globally-billed services into professional and technical components, and thus must use a complicated algorithm to allocate to the physicians the professional component.

**RESPONSE:** FDLRC denies the allegations in Paragraph 139.

140.    However, there are well established procedures (e.g., the CPT-based relative value unit ("RVU") methodology) recognized by Medicare and elsewhere in the health care industry to establish the relative cost of the professional and technical components if billed separately. Moreover, to the extent that Relator has been allowed to see certain tables showing parts of how Agnesian's methodology works, it appears Agnesian's methodology routinely assigned more of the overall fee to the professional component (and thus to the physician) than the industry-recognized, CPT-based relative value unit methodology would. As such, the physicians are given more of the overall fee than they would receive if the professional component and the technical component were billed separately or allocated using the industry-

---

[2] The Medical Group Management Association ("MGMA") is a private, professional membership organization. SullivanCotter and Associates is a consulting firm that specializes in evaluating physician compensation. Both organizations perform annual surveys of healthcare providers to generate data on physician compensation. This proprietary survey data is frequently consulted when setting or evaluating physician compensation.

MIL-29184473-1

recognized CPT/RVU. Functionally, this means that Agnesian is giving these physicians a share of its billings for services performed by the Clinic or hospital, not the physician.

**RESPONSE:** FDLRC denies the allegations in Paragraph 140.

141.    The use of a complex and opaque methodology when a simple one is readily available, as well as the consistent discrepancy between FDLRC physician compensation and productivity, indicates that Agnesian is likely adjusting collections to reward valuable physicians, such as those who refer heavily and/or perform lucrative procedures at hospital facilities.

**RESPONSE:** FDLRC denies the allegations in Paragraph 141.

142.    For these reasons, Relator alleges on information and belief, that Agnesian is regularly giving physicians a portion of the technical component fees received in payment for services performed by the Clinic and/or hospitals.

**RESPONSE:** FDLRC denies the allegations in Paragraph 142.

143.    Another way that Agnesian overcompensates the Clinic physicians is through its deferred compensation plan (the "DCP"). The DCP compensation is problematic both because it further inflates the already-too-high compensation Agnesian pays these physicians, and because this compensation is explicitly tied to an agreement by the physicians not to compete with Agnesian. As such, this is effectively a payment by Agnesian to these physicians to ensure that they continue to refer their patients to Agnesian.

**RESPONSE:** FDLRC denies the allegations in Paragraph 143.

144.    FDLRC physicians, upon becoming "shareholders" of the Clinic are enrolled in the DCP. Upon enrollment, the physician is given a deposit into their account equal to 4.5% of the value of all compensation the physician received as an associate. Thereafter, each physician's account is credited annually with an amount equal to 7.5% of his or her cash compensation.

**RESPONSE:** FDLRC admits only that it maintains a DCP for its shareholder physicians.

FDLRC denies all remaining allegations in Paragraph 144 as the structure of the DCP has

changed over time and Relator fails to specify the DCP to which the allegations relate.

145.    The physician's entitlement to these funds vests over the course of ten years, with half vesting after five years and an additional 10% vesting per year thereafter.

**RESPONSE:** FDLRC denies the allegations in Paragraph 145 as the structure of the

DCP has changed over time and Relator fails to specify the DCP to which the allegations relate.

40

146.    Regardless of whether the funds are vested, however, the physician's right to receive the funds is explicitly tied to the physician's agreement to avoid "competing" with Agnesian for two years after the physician leaves FDLRC.

**RESPONSE:** FDLRC denies the allegations in Paragraph 146 as the structure of the DCP has changed over time and Relator fails to specify the DCP to which the allegations relate.

147.    Prior to 2009, the non-compete extended over about 30 miles. It was amended and expanded two-fold in 2009 when the plan administrator changed. This change coincided with increased compensation for physicians under the DCP as the physicians became responsible for paying significantly lower management fees to the plan administrator.

**RESPONSE:** FDLRC admits only that the non-compete was amended in 2009. The remaining allegations in Paragraph 147 relate to partially characterized DCP documents, and FDLRC therefore denies same.

148.    Under the current DCP, competition is defined as "engaging in the practice of medicine in competition with Agnesian Healthcare, Inc. or any affiliate either (i) within the Wisconsin counties of Winnebago, Calumet, Sheboygan, Washington, Dodge, Fond du Lac, Green lake, Manitowac or Outagamie or (ii) as a direct or indirect employee or contractor with . . . Aurora Medical Group, including any of its affiliates and/or successors." The geographic limitation imposed by the excluded counties would essentially require a physician to practice at least sixty miles away from Fond du Lac.

**RESPONSE:** Paragraph 148 contains allegations relating to a partially quoted and characterized DCP document, and FDLRC therefore denies same.

149.    Thus, through the DCP, Agnesian pays these physicians a bonus that is directly tied to the volume and value of services the physician previously performed for and referred to AHC, and makes this payment explicitly contingent on the physician (so long as he or she wishes to continue to live and work in the area): 1) remaining affiliated with Agnesian; 2) refraining from offering medical services in Agnesian's market to patients that would otherwise likely seek services from Agnesian; and 3) refraining from affiliating with a competitor and, correspondingly, sending such a competitor their referrals.

**RESPONSE:** FDLRC denies the allegations in Paragraph 149.

150.    CMS has noted that payments to physicians for non-compete agreements by providers in a position to retain their referrals are inherently suspect under the Anti-Kickback statute because of the risk that such payments are merely disguised payments for referrals. *See* Letter from D. McCarty Thorton, Associate General Counsel, Department of Health and Human Services, Inspector General Division, to T.J. Sullivan, Technical Assistant (Health Care Industries), Office of the Associate Chief Counsel, Internal Revenue Services, December 22,

41

1992, http://oighhs.gov/fraud/docs/safeharborregulations/acquisition122292.htm ("Specific items that we believe would raise a question as to whether a payment was being made for the value of a referral stream would include, among other things: . . . payment for covenants not to compete").

**RESPONSE:** Paragraph 150 contains allegations relating to a partially quoted letter, and FDLRC therefore denies same.

151.     That risk is particularly high in this case because the FDLRC physicians already enter into a more modest non-compete agreement as part of their standard employment agreement.  This non-compete prohibits each physician, for two years from the end of his/her employment with the Clinic, from practicing the medical specialty he/she practiced for the Clinic within 10 miles of any location at which the physician regularly worked during the two years prior to his/her termination.

**RESPONSE:** FDLRC denies the allegations in Paragraph 151.

152.     Pursuant to the Anti-Kickback Statute and Stark Law, non-competition agreements may be appropriate to protect an employer's legitimate interests, e.g., confidential business information.  However, they must be limited in scope so as to protect only such legitimate interests.  Non-competes may not be used as a pretext to pay physicians to ensure the flow of their referrals to a hospital or related entity. Cf. *United States ex rel. Singh v. Bradford Regional Medical Center*, 752 F. Supp. 2d 602, 622-23 (W. D. Pa. 2010) (finding that a report calculating the value of a non-compete based on the referrals that would flow to the provider in the presence of the non-compete demonstrated that the payments for the non-compete "took into account" the volume and value of the physicians' referrals in violation of the Stark Law).

**RESPONSE:** Paragraph 152 contains allegations relating to partially referenced, quoted, and characterized authority, and FDLRC therefore denies same.

153.     The restrictions of the DCP non-compete, which would require a physician in Fond du Lac to travel at least 60 miles in any direction to avoid the non-compete, go far beyond keeping a physician from soliciting clients with whom he/she formed relationships as a result of Agnesian's efforts.  Rather, the non-compete effectively prevents physicians from drawing referrals from Agnesian facilities, either by independently offering professional services or working for Agnesian's primary competitor.

**RESPONSE:** FDLRC denies the allegations in Paragraph 153.

154.     Beyond the standard compensation arrangements described above, Agnesian makes special deals to pay extra compensation to physicians who make substantial referrals to, or perform lucrative procedures at, Agnesian.

**RESPONSE:** FDLRC denies the allegations in Paragraph 154.

155.    For example, at least between 2008 and 2011, Agnesian paid Dr. Dennis Woodhall $200,000 per year to serve as the medical director for Agnesian's cardiology program. Relator understands that Dr. Woodhall did little to no work to justify this compensation. Rather, this money was included in Dr. Woodhall's compensation to get his overall compensation to the desired level. He was the first cardiothoracic surgeon at Agnesian and established the Heart Surgery program, a very profitable program that generates millions of dollars in facility fees for services including, *inter alia*, catheterizations and heart surgeries.

**RESPONSE:** FDLRC admits only that Dr. Woodhall served as medical director for cardiology at St. Agnes Hospital, that he was compensated for those medical director services, and that he was instrumental in establishing Agnesian's heart surgery program. FDLRC denies all remaining allegations in Paragraph 155.

156.    In 2012, the Agnesian billing office disclosed to the Clinic Board that the Clinic's ENTs had been receiving credit when calculating their "collections" for audiograms that were incorrectly credited to them. This had resulted in approximately $10,000/year in additional compensation for each ENT. Relator believes that this improper crediting process was halted but the improper compensation was never disclosed to government payers or recouped. Far from taking steps to correct the improper compensation, the Clinic Board's sole interest was in determining a means of ensuring that the compensation of these specialists was not decreased as a result of the corrected billing.

**RESPONSE:** Paragraph 156 contains allegations relating to partially characterized communications, and FDLRC therefore denies same. Further answering, FDLRC avers that all billing of the referenced services was appropriate and in compliance with all applicable laws.

157.    The Clinic's primary care physicians have also received special treatment from Agnesian. In addition to the DA adjustment described above, the Clinic's primary care doctors have been granted certain allowances not given to other doctors. For example, the primary care doctors are allowed to cap the number of Medicare and Medicaid patients they see. This effectively increased the compensation of the primary care physicians because their cash compensation was based on their collections and commercial payers generally pay more than Medicare and Medicaid.

**RESPONSE:** FDLRC denies the allegations in Paragraph 157. Further answering, FDLRC affirmatively alleges that FDLRC routinely addressed changes to physician compensation in accordance with its internal policies and procedures, and that any and all

43

modifications to compensation were commercially reasonable, at fair market value, and in compliance with all applicable laws.

158.    Agnesian was forced to open another clinic location wholly staffed by nurse practitioners and physician assistants to see the Medicare and Medicaid patients who could not get in to see the Clinic's primary care doctors.  To free the primary care doctors from supervisory responsibilities at these locations, Agnesian also brought in hospital-employed doctors to perform these duties.

**RESPONSE:**  FDLRC denies the allegations in Paragraph 158.

159.    In addition, the primary care physicians have been permitted to retain their high DAs despite refusal to take call at St. Agnes.  Under the standard Clinic employment contract, taking call, *i.e.*, being available to hospital patients in case of emergency, is a requirement for Clinic physicians to retain their right to full-time compensation.  Despite this, the primary care physicians, per their demand, were given the option to retain their full-time compensation despite their refusal to take standard call, by providing other more lifestyle-friendly services such as extending office hours, providing limited call coverage (predominantly by telephone), and visiting nursing home patients.

**RESPONSE:**  FDLRC denies the allegations in Paragraph 159

160.    The PSA governing the relationship between AHC and FDLRC requires AHC to conduct an annual review of the compensation paid to FDLRC physicians to ensure that the compensation is "reasonable and that such does not . . . exceed fair market value for services in arm's length transactions."  In addition, FDLRC must certify that the compensation provided by AHC to FDLRC and by FDLRC to each individual employee is "reasonable, based upon (i) the most recent annual Physician Compensation Survey published by Medical Group Management Association ["MGMA"]; (ii) available data from the American Medical Group Practice Association; (iii) available data from state and/or local medical societies, which may help to establish the ranges of salaries for like specialties in Wisconsin and in communities similar in size and socio-economic demographics; and (iv) other relevant information, including the current [salary and benefits payments to FDLRC] and each individual Physician relative to the collective and individual performance as reflected in the Productivity Indicators for each individual Physician."

**RESPONSE:**  FDLRC denies the allegations in Paragraph 160 because Relator fails to specify the PSA to which his allegations relate.

161.    To meet this requirement, in May 2008, Agnesian hired MGMA's Health Care Consulting Group to "assess the productivity and compensation levels" of its employed physicians.

**RESPONSE:** FDLRC is without sufficient knowledge or information to admit or deny the allegations in Paragraph 161, and, therefore, denies them.

162.    MGMA issued a "draft" report that found substantial problems with Agnesian's physician compensation practices. Specifically, the report found that Agnesian's compensation plan did not follow "generally accepted criteria for better performing practices" because, *inter alia*,:

- "Compensation isn't correlated to employment market surveys."

- "Almost every specialty department's compensation exceeds market survey medians."

- "Production . . . generally does not correlate with the higher physician compensation."

- "In almost every case, the value of a work RVU [*i.e.*, the amount paid per unit of work] for the Group exceeds survey benchmarks." and

- "Compensation has an indirect correlation to physician productivity."

**RESPONSE:** Paragraph 162 contains allegations relating to a partially quoted and characterized draft report, and FDLRC therefore denies same.

163.    MGMA's report included tables of data showing that the amount Agnesian paid its physicians per wRVU exceeded benchmark market rates for all but two physicians. The physician per wRVU payments exceeded the benchmark medians by up to 220%. Eleven specialties (of the 22 reviewed) had disparities between their compensation and production percentiles of 20 points or more.

**RESPONSE:** Paragraph 163 contains allegations relating to a partially quoted and characterized draft report, and FDLRC therefore denies same.

164.    The draft MGMA analysis was never turned into a final report, and Agnesian did not engage MGMA's services further to fix these problems.

**RESPONSE:** FDLRC is without sufficient knowledge or information to admit or deny the allegations in Paragraph 164, and, therefore, denies them.

165.    Instead, Agnesian reverted to use of its own internal review process, whereby the Clinic's Administrator (until recently, Dennis Yunk) performed a rough analysis of physician compensation. Mr. Yunk had no training or experience in assessing physician compensation. He determined that most physicians' compensation was appropriate simply because it fell within

45

one standard deviation of the mean compensation for that specialty — regardless of physician productivity, hours worked, or any other factor.

**RESPONSE:** FDLRC denies the allegations in Paragraph 165.

166.    For the remaining physicians, Mr. Yunk's 2008 analysis ignores most MGMA standards generally consulted in assessing physician pay (such as productivity, collections, or pay per wRVU) and instead relies almost entirely on a single cherry-picked measure ("gross charges") to justify the pay of highly-compensated physicians.  As gross charges generally bear no relation to costs or effort, and are often arbitrarily set by hospitals (particularly when relatively unconstrained by competition and a lack of pricing transparency), this measure, standing alone, has little value in assessing a physician's fair market value compensation.

**RESPONSE:** FDLRC denies the allegations in Paragraph 166.

167.    Mr. Yunk continued to conduct the Clinic's annual analysis of physician compensation through his departure in January 2014.  He has confirmed to Relator that his analyses consistently relied on "gross charges" to justify the compensation of highly-paid physicians.  He explained his reliance on this measure by saying something to the effect of: "the high earners bill a lot so they should make a lot."

**RESPONSE:** FDLRC denies the allegations in Paragraph 167. Further answering, FDLRC affirmatively alleges that the aggregate compensation paid to physicians was fair market value, commercially reasonable, and compliant with all applicable laws.

168.    Throughout his time at Agnesian, the analyses of FDLRC physician compensation that Relator has seen have shown a consistent pattern, where physician compensation far exceeds benchmark levels given the physicians' productivity.

**RESPONSE:** FDLRC denies the allegations in Paragraph 168. Further answering, FDLRC affirmatively alleges that the aggregate compensation paid to physicians was fair market value, commercially reasonable, and compliant with all applicable laws.

169.    This overcompensation is driven by the improper compensation methodologies described above as well as by Agnesian's over-valuation of physician services.  For example, Agnesian credits FDLRC physicians with 30% of billed charges for charity care and bad debt patients.  This equates to "collections" (for purposes of calculating physician compensation), equal to about 2 to 3 times what Medicare would pay for the service, by definition what it would cost a reasonably efficient practice to provide the service.

**RESPONSE:** FDLRC denies the allegations in Paragraph 169. Further answering, FDLRC affirmatively alleges that the aggregate compensation paid to physicians was fair market value, commercially reasonable, and compliant with all applicable laws.

170.    These overpayments have been and continue to be made knowingly. At a March 5, 2014 meeting of the PSA Committee, Agnesian's Medical Director, Dr. Derek Colmenares, stated that Agnesian had considered further external evaluations of physician compensation in the past, "but never did it because we were afraid it would show that we have a problem."

**RESPONSE:** FDLRC denies the allegations in Paragraph 170.

171.    Agnesian uses its overly generous base compensation practices to lure physicians to Agnesian and away from Aurora. For example, around 2010, two independent orthopedic surgeons in Fond du Lac were contemplating affiliating with a local hospital. They leased office space in a building owned by Aurora, sent all of their lab work and ancillaries to Aurora facilities in Fond du Lac, and performed their surgeries at the Aurora surgery center in Fond du Lac. To convince these doctors to join FDLRC, Agnesian personnel offered them an income guarantee but assured them that no guarantee was necessary because the physicians would make $100,000-$150,000 more per year based solely on FDLRC's base compensation methodology. The physicians joined FDLRC and have since sent virtually all of their referrals to Agnesian's facilities.

**RESPONSE:** FDLRC denies the allegations in Paragraph 171. Further answering, FDLRC states that all services provided by physicians were appropriate, medically necessary, and properly reimbursable based on compliance with all applicable laws.

172.    The PSAs between Agnesian and the Clinic have historically run for five year terms. Around 2013, Agnesian began preparing to negotiate the new PSA that would go into effect on January 1, 2016. Relator was a member of the Clinic's PSA Committee tasked with recommending terms for the 2016 PSA.

**RESPONSE:** FDLRC admits the allegations in Paragraph 172.

173.    As part of the committee's process, Agnesian hired an attorney by the name of Michael Bamberger to serve as a consultant and to educate the Clinic members about reimbursement methodologies and regulatory requirements for hospitals and affiliated physician groups. Mr. Bamberger was not an attorney for either AHC or the Clinic. Rather, he served as a third-party neutral, hired to assist with the review, evaluation, and development of the PSA.

MIL-29184473-1

**RESPONSE:** Paragraph 173 contains allegations relating to a partially characterized agreement between Mr. Bamberger, Agnesian, and the Clinic, and FDLRC therefore denies same.

174.     After reviewing the Clinic's historical performance and physician compensation, he advised the Clinic that the then-current compensation methodology (based on collections and the specialty-specific DA) was problematic from a compliance perspective and that the Clinic physicians were significantly overcompensated as compared to relevant benchmarks.

**RESPONSE:** FDLRC admits only that Mr. Bamberger reviewed certain compensation surveys with FDLRC's PSA committee and noted that the compensation to wRVU ratio for some physicians was above certain published surveys. FDLRC denies all remaining allegations in Paragraph 174. Further answering, FDLRC states that issues raised by Mr. Bamberger (who is not a fair market valuation expert and was not hired to perform a fair market valuation analysis) were rejected by national valuation experts consulted by Mr. Bamberger.

175.     For example, Mr. Bamberger prepared an analysis of the Clinic physicians' 2012 compensation as compared to MGMA data.  He found that overall, physician compensation fell in the 69th percentile for the Midwest region — more than 20 points higher than the wRVU percentile for the group (which was at the 47th percentile).  Further, nine of the 18 clinic specialties he reviewed had a spread of more than 20 points between their compensation and wRVU percentiles, including spreads as high as 28 points (for internists), 38 points (for plastic surgeons), 41 points (for family medicine with OB specialists), and 61 points (for oncologists). At a February 12, 2014 meeting where 2012 Clinic compensation was discussed, Bamberger advised the Clinic leadership that "experts caution that a problem can arise when compensation at a high percentile is linked to production at a much lower percentile (e.g. a discrepancy in excess of a 20 percentile spread)."

**RESPONSE:** FDLRC admits only that minutes from the February 12, 2014 meeting reflect Mr. Bamberger making the statement attributed to him in Paragraph 175. FDLRC denies all remaining allegations in Paragraph 175. Further answering, FDLRC states that the issues raised by Mr. Bamberger (who is not a fair market valuation expert and was not hired to perform a fair market valuation analysis) were rejected by national valuation experts consulted by Mr. Bamberger.

MIL-29184473-1

176.     To address this overcompensation, Mr. Bamberger proposed a compensation methodology based on MGMA's Midwest data.    Under his proposed compensation methodology, Clinic physicians would have been paid according to the best fit line drawn by analyzing MGMA Midwest compensation data, with increased compensation for high-producers and for meeting certain quality metrics.   As applied, at least 54 Clinic physicians would have received reduced compensation, including every single family practitioner and internist, generally on the order of tens of thousands of dollars.

**RESPONSE:** FDLRC admits only that Mr. Bamberger proposed an alternative compensation methodology but denies it was based solely on MGMA's Midwest data.   The remaining allegations in Paragraph 176 partially characterize the subject writing, and are therefore denied.

177.     The Clinic rejected Mr. Bamberger's proposal.   Rather, a patchwork methodology was pieced together with the primary focus being maintaining physician compensation at historic and above fair market value levels.   Dr. Richard Schaefer, an FDLRC physician, created the outline of such a methodology.   In a July 17, 2014 presentation to the Clinic's PSA Committee, Dr. Schaefer delivered a PowerPoint presentation regarding his proposed new compensation methodology.   One of the "top goals" for the new compensation methodology, according to the presentation, was that it be "income neutral" — *i.e.*, that the Clinic physicians remain "whole." As a demonstration of this need, Dr. Schaefer included slides showing that under a strict application of the best fit line derived from MGMA's regional data, the interventional cardiologists would take a pay cut of $260,000 (23%) and the internists would take a pay cut of $50,000 (16%).   The question presented then, as the presentation put it, was "So, how do we logically, increase the pay of invasive cardiology $260,000 (-23%) and IM/P $50,000 (-16%) using the same formula[?]" Dr. Schaefer's proposal, and the compensation methodology as adopted, increases physician compensation above the best fit line based on standard deviations. The formal requirements for this increased compensation are discussed further below, but the intent of the new methodology was clear: to ensure physician compensation was not reduced as the DA was eliminated.   As Dr. Schaefer explained when describing the need for two-tenths of a standard deviation bump for specialists and three-tenths of a standard deviation bump for primary care physicians: "[it is] necessary to avoid a profound drop in compensation."

**RESPONSE:** FDLRC denies the allegations in Paragraph 177.

178.     Mr. Bamberger continued to offer his objections to the proposed methodology. He stated his belief that the proposed increased compensation based on CME credits obtained and longevity with the Clinic was inappropriate and that the proposed "overall compensation in relation to work performed was excessive."   He stated specifically that "primary care [doctors] are overpaid."   He went on to state, "I don't mean that in a legal sense . . . yes I do . . . . I'm here to make you compliant because you aren't."   On several occasions he stated that Agnesian could not continue to pay the Clinic primary care doctors "so much money for so little work."   At a December 8, 2014 meeting of the PSA Committee, in response to a question about whether pay

cuts for primary care physicians could be phased in over time, Mr. Bamberger stated that "the plan isn't compliant now and needs to be brought into compliance in one step, not over time."

**RESPONSE:** FDLRC denies the allegations in Paragraph 178.

179.    Mr. Bamberger's services were terminated and Agnesian proceeded to adopt a compensation methodology specifically designed to maintain physician compensation at historic and above-fair market value rates. Doing so required a series of carve-outs and special deals. In theory, the methodology provides that physicians are to be paid based on their productivity according to the best-fit line drawn for their specialty based on data from several surveys, with increases or decreases for outlier productivity levels, and increases for meeting certain quality-type metrics. In fact, there are contortions designed to reward high-referring physicians at every step of the equation.

**RESPONSE:** FDLRC denies the allegations in Paragraph 179.

180.    For example, only primary care physicians can receive a full standard deviation in increased compensation. Specialists can receive at most 90% of a standard deviation. Further, the value of a standard deviation is arbitrarily capped with a floor and ceiling to favor primary care physicians. The standard deviation for the Clinic internists should be about $45,000, but to increase compensation for these physicians, Agnesian declared the minimum standard deviation to be $90,000. Likewise, the standard deviation for orthopedists should be well in excess of $250,000 but Agnesian capped it at $250,000. Primary care physicians are given additional preferential treatment in that the increased compensation they receive for being a "high-producer" is greater than that received by specialists. Additionally, they can receive full credit towards their incentive compensation by providing nursing home care or nursing home coverage while the specialists have to provide emergency department call coverage to obtain the same credit. These tasks are known not to be equivalent in time and effort.

**RESPONSE:** Paragraph 180 contains allegations relating to a partially characterized PSA, and FDLRC therefore denies same.

181.    Clinic oncologists, whose compensation has historically been significantly higher than would be predicted based on their productivity, receive compensation at the 60th percentile of compensation for their best fit line regardless of their actual productivity (which has been as low as the 10th or 20th percentile). In addition, they remain eligible for incentive compensation.

**RESPONSE:** Paragraph 181 contains allegations relating to a partially characterized PSA, and FDLRC therefore denies same. Further answering, FDLRC affirmatively alleges that the aggregate compensation paid to physicians was fair market value, commercially reasonable, and compliant with all applicable laws.

182.    Finally, the metrics for incentive compensation are designed to allow all Clinic physicians to capture the full amount available.  For example, all shareholders are required to be board certified (a metric supposedly worth 10 points).  And the requirements for "leadership" credit are minimal.  For example, a physician coaching his/her child's soccer team for two hours a month would receive full credit for "substantial involvement" in community service activities.

**RESPONSE:** FDLRC denies the allegations in Paragraph 182.

183.    Agnesian's above fair market value, commercially unreasonable, and referral-based compensation constitutes payment in exchange for referrals as defined by the Anti-Kickback Statute and creates improper financial relationships between AHC and FDLRC and the physicians employed by the Clinic as defined by the Stark Law.  These relationships do not fall within a safe harbor for either statute.

**RESPONSE:** FDLRC denies the allegations in Paragraph 183.

184.    Agnesian knowingly made false claims to federal and state healthcare programs for kickback-tainted services and for designated health services referred by physicians with whom Agnesian had financial relationships that did not fall within a safe harbor in violation of the Stark Law.

**RESPONSE:** FDLRC denies the allegations in Paragraph 184.

185.    A substantial portion of the patients seen by FDLRC physicians and treated at Agnesian facilities are beneficiaries of federal and state healthcare programs.  In a year-to-date report from November 2012, FDLRC's payor mix was 36% Medicare and 9% Medicaid.

**RESPONSE:** FDLRC admits only that its physicians see Medicare and Medicaid patients in different volumes. The remaining allegations in Paragraph 185 relate to a partially characterized and unidentified report, and FDLRC therefore denies same.

186.    During Relator's tenure practicing at Agnesian, he observed that for virtually all FDLRC physicians, with the exception of the pediatric and obstetric specialties, their practices were made up in substantial part of Medicare beneficiaries.  Similarly, virtually all FDLRC physicians, including the pediatric and obstetric specialties, saw some Medicaid beneficiaries.

**RESPONSE:** FDLRC admits only that its physicians see Medicare and Medicaid patients in different volumes with the mix of payors varying year to year by physician and specialty, and denies all remaining allegations in Paragraph 186.

187.    Because the FDLRC physicians referred the vast majority of their patients for ancillaries and hospital services to Agnesian, Agnesian regularly submitted bills to government-funded healthcare plans for services, including DHS, referred by the FDLRC physicians.

51

**RESPONSE:** FDLRC admits that FDLRC provides medically necessary and proper care including ancillary and hospital services that are performed at Agnesian. FDLRC denies all remaining allegations in Paragraph 187.

188.   All claims for services referred by these physicians are false under the False Claims Act by virtue of the improper compensation arrangements and kickbacks between the physicians and the network.

**RESPONSE:** FDLRC denies the allegations in Paragraph 188.

189.   These claims are materially false and damaged the government on the order of millions of dollars.   The prohibition on the payment of kickbacks and referral of services between parties with improper financial relationships is material to the United States.   Medicare and other federal and state healthcare programs would not have paid the claims submitted by Agnesian if they had known the true facts regarding Agnesian's payments to the FDLRC physicians to induce their referrals.

**RESPONSE:** FDLRC denies the allegations in Paragraph 189.

190.   The Anti-Kickback Statute has been on the books and well known to healthcare providers since 1972, and has been strengthened by Congress on multiple occasions.   In 1977, Congress passed the Medicare-Medicaid Anti-Fraud and Abuse Amendments, making AKS violations a felony.   P.L. 95-142, 91 Stat. 1175 (Oct. 25, 1977), *codified as* 42 U.S.C. § 1320a-7b.   As a House Report states: "In whatever form it is found, fraud in these health care financing program[s] . . . cheat[] taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program.   It diverts from those most in need, the nation's elderly and poor ... The wasting of program funds through fraud also further erodes the financial stability of those state and local governments whose budgets are already overextended ..." H. Rep. 95-393, 95th Cong., 1st Sess. at 44, *reprinted in* 1977 U.S.C.C.A.N. 3039, 3047.   The Medicare and Medicaid Protection Act of 1987 mandated exclusions for those convicted of program-related kickbacks and broadened the Secretary's authority to exclude providers from the program for fraud, kickbacks and other abuses.   S. Rep. 100-109, 100th Cong., lst Sess. at 1-2, reprinted in 1987 U.S.C.C.A.N. 682, 682-683.

**RESPONSE:** Paragraph 190 contains allegations of law relating to partially referenced and quoted laws and legislative history to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

191.   The prohibition on kickbacks is designed to ensure that such compensation does not influence decisions, resulting in the provision of goods and services that are medically unnecessary, of poor quality, or even harmful to vulnerable patient populations, and applies regardless of whether a particular kickback actually gives rise to overutilization or results in poor quality care.   With the Anti-Kickback Statute, the government expressly discourages the

potential effect that payments for referrals might have on patient care decisions. As set forth above, the law provides that "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]," a provision intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act[.]" 155 Cong. Rec. S10854.

**RESPONSE:** Paragraph 191 contains allegations of law relating to partially referenced and quoted statutes to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

192. Noncompliance with the Anti-Kickback Statute by Medicare providers is not minor or insubstantial. The United States regularly prosecutes violations of the Anti-Kickback Statute. The criminal nature of Anti-Kickback Statute violations highlights the importance to the government of compliance. The government does not pay for government healthcare program claims that are the product of conduct that violates the Anti-Kickback Statute, and to submit such a claim for reimbursement is in effect asking the government to fund criminality retroactively, a result that would be proscribed by the Anti-kickback Statute. 42 U.S.C.S. § 1320(a)-7(b).

**RESPONSE:** Paragraph 192 contains allegations of law relating to partially referenced and characterized statutes to which no response is required; to the extent a response is deemed necessary, FDLRC denies same. Further answering, FDLRC notes that the United States has elected not to intervene in this case or otherwise prosecute the allegations set forth herein.

193. The government does not get what it bargained for when a defendant is paid for services tainted by a kickback. Compliance with the Anti-Kickback Statute is therefore key to the government's reimbursement decision. Moreover, the fact that CMS enrollment and claim forms identify compliance with the Anti-Kickback Statute as a requirement for the provider to bill Medicare further demonstrates the materiality of compliance with the Anti-Kickback Statute as a precondition for payment of claims.

**RESPONSE:** Paragraph 193 contains allegations of law relating to partially referenced statutes to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

194. Any reasonable person, particularly Medicare providers such as Agnesian and the Clinic knows or would have known that that United States attaches importance to the Anti-Kickback Statute and that CMS does not pay for items or services resulting from a violation of the Anti-Kickback Statute. Every claim to Medicare, Medicaid, and other federal and state healthcare programs tainted by Agnesian's unlawful compensation arrangement with the FDLRC

physicians was false or fraudulent under the False Claims Act. Moreover, Agnesian represented and certified on CMS enrollment and payment forms that it had complied with applicable laws and regulations, including, specifically, the Anti-Kickback Statute. Had CMS known of Agnesian's fraudulent scheme, it would not have paid these false and fraudulent claims because they were tainted by kickbacks. When Agnesian made its false certifications, it knew that it had not complied and would not comply with the Anti-Kickback Statute and that it wrongfully retained CMS reimbursements for tainted claims.

**RESPONSE:** FDLRC denies the allegations in Paragraph 194.

195.    The same is true for claims submitted in violation of the Stark Law. Compliance with Stark is material to the government's payment decision and CMS would not have paid Agnesian's claims had it known the true facts regarding Agnesian's improper financial relationships with the FDLRC physicians.

**RESPONSE:** FDLRC denies the allegations in Paragraph 195.

196.    Congress passed the Stark Law to eliminate the corrupting influence of money on medical decision-making. Enacted by amendment to the Medicare statute in 1989, the Stark Law establishes the clear rule that the United States will not pay an entity for certain items or services ("designated health services" or "DHS") referred by any physician having a "financial relationship" with the entity, unless the relationship satisfies an applicable exception. 42 U.S.C. §§ 1395n.n(a)(1), (g)(1); *see United States v. Rogan*, 459 F. Supp. 2d 692, 711 (N.D. Ill. 2006), aff'd, 517 F.3d 449 (7th Cir. 2008). "The Stark Law is intended to prevent `overutilization of services by physicians who [stand] to profit from referring patients to facilities or entities in which they have a financial interest.'" *United States ex. rel. Drakeford v. Tuomey*, 675 F.3d 394, 373 (4th Cir. 2012) (citation omitted). Any amounts reimbursed by Medicare for services furnished in violation of the Stark Law must be repaid. 42 U.S.C. § 1395nn(g)(1); 42 C.F.R § 411.353(d); *Drakeford,* 675 F.3d at 397-98; *Rogan*, 517 F.3d at 453.

**RESPONSE:** Paragraph 196 contains allegations of law relating to partially referenced

and quoted statutes and authority to which no response is required; to the extent a response is

deemed necessary, FDLRC denies same.

197.    An analysis of the materiality factors recently identified in *Escobar* makes clear that compliance with the Stark Law is material to the United States' decision to reimburse healthcare claims. First, and most significantly, the Stark Law expressly prohibits Medicare from paying claims that violate that provision. 42 U.S.C. §§ 1395rm(a)(1), (g)(1). In *Escobar*, the Supreme Court clarified that the government's decision to identify a provision as a condition of payment is evidence (even if not dispositive) of materiality. 136 S. Ct. at 2003-04. In enacting the Stark Law, however, Congress did not merely label the statute a condition of payment, but made clear that it is a mandatory condition, which is the strongest possible indication of materiality. This statutory language is echoed by the accompanying regulations, which explicitly require an entity to refund promptly any Medicare payments it has received in violation of the Stark Law. 42 C.F.R. § 411.353(d). In particular, since 1995, the agency has promulgated

detailed regulations under the Stark Law, together with extensive commentary concerning those regulations. See, e.g., 66 Fed. Reg. 856 (Jan. 4, 2001); 69 Fed. Reg. 16054 (Mar. 26, 2004); 72 Fed. Reg. 51012 (Sept. 5, 2007). In the preamble to the 2001 regulations, the agency warned that, even in the absence of a knowing violation, the failure to comply with the statute renders claims unpayable: "For example, if a hospital has a $5,000 consulting contract with a surgeon and the contract does not fit in an exception, every claim submitted by the hospital for. Medicare beneficiaries referred by that surgeon is not payable . . . . " 66 Fed. Reg. at 860. This statutory prohibition on payment is clear and unambiguous, and any reasonable person would "attach importance" to it in "determining a choice of action in the transaction." *Escobar*, 136 S. Ct. at 2002-03.

> **RESPONSE:** Paragraph 197 contains allegations of law relating to partially referenced and quoted statutes, regulations and authority to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

198.    Second, compliance with the Stark Law goes to the "essence of the bargain" that providers strike with federal health care programs. "The Stark Law is intended to prevent overutilization of services by physicians who [stand] to profit from referring patients to facilities or entities in which they have a financial interest.'" *Drakeford*, 792 F.3d at 373 (citation omitted). In other words, the Stark Law plays a key role in ensuring that services are reasonable and necessary — and not provided merely to enrich the referring physician.

> **RESPONSE:** Paragraph 198 contains allegations of law relating to partially referenced and quoted authority to which no response is required; to the extent a response is deemed necessary, FDLRC denies same.

199.    Third, the United States has consistently and repeatedly pursued FCA claims for violations of the Stark Law, including in circumstances similar to those present here, where a hospital overpays employed and/or affiliated physicians to induce their referrals.

> **RESPONSE:** Paragraph 199 contains allegations relating to unidentified cases, and FDLRC therefore denies same. Further answering, FDLRC notes that the United States has elected not to intervene in this case or otherwise pursue the allegations set forth herein.

200.    Agnesian and FDLRC's violations are not "minor or insubstantial," but rather constitute significant violations of the Stark Law. Stark's requirement that compensation arrangements with referring physicians be fair market value and not take into account the volume or value of referrals go to the heart of Stark's purpose — to ensure that medical services are ordered because they are medically appropriate, not because their provision benefits the referring physician financially.

55

**RESPONSE:** FDLRC denies the allegations in Paragraph 200. Further answering, FDLRC denies that it was party to or involved in a scheme with Agnesian in violation of the Stark Law, Anti-Kickback Statute, or any other laws or statutory provisions related to the compensation paid under the PSAs at issue in this case. Indeed, the compensation was compliant with all applicable laws and properly intended to support Agnesian's mission and strategic goal of providing community benefit by improving access to health services and providing appropriate healthcare to all members of the community. FDLRC further states that all billings of services relating to FDLRC physicians were proper, appropriate and correctly reimbursable.

**Count I**
**False Claims Act**
**31 U.S.C. §§3729(a)(1)(A)-(B) and (G)**

201.　Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 200 above as though fully set forth herein.

**RESPONSE:** In response to paragraph 201 of the Complaint, FDLRC reasserts its responses to each of the preceding paragraphs of the Complaint.

202.　This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended, including on the bases of violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and the Stark Law, 42 U.S.C. § 1395nn.

**RESPONSE:** The allegations in Paragraph 202 constitute legal conclusions to which no response is required.  To the extent a response is required, FDLRC denies the allegations, except that it admits that Relator is proceeding on this basis.

203.　By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

**RESPONSE:** FDLRC denies the allegations in Paragraph 203.

204.　By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims.

56

**RESPONSE:** FDLRC denies the allegations in Paragraph 204.

205. By virtue of the acts described above, Defendants conspired to submit false claims, cause false claims to be submitted, and make and/or us false or fraudulent records material to false claims.

**RESPONSE:** FDLRC denies the allegations in Paragraph 205.

206. By virtue of the acts described above, Defendants knowingly concealed overpayments from the United States Government and failed to remit such overpayments.

**RESPONSE:** FDLRC denies the allegations in Paragraph 206.

207. The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

**RESPONSE:** FDLRC denies the allegations in Paragraph 207.

208. Had the United States Government known of these false and fraudulent presentations of claims, it would not have paid such claims for services provided under Medicare, Medicaid or other federal health program.

**RESPONSE:** FDLRC denies the allegations in Paragraph 208.

209. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**RESPONSE:** FDLRC denies the allegations in Paragraph 209.

210. Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each violation committed on November 2, 2015 or before (and up to $21,563 for each violation committed after November 2, 2015).

**RESPONSE:** FDLRC denies the allegations in Paragraph 210.

<u>**Count II**</u>
<u>**Wisconsin False Claims for Medical Assistance Law**</u>
<u>**Wis. Stat. §§ 20.931(2)(a)-(c), (g)**</u>

211. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 211 above as though fully set forth herein.

**RESPONSE:** In response to paragraph 211 of the Complaint, FDLRC reasserts its responses to each of the preceding paragraphs of the Complaint.

57

212.     This is a claim for treble damages and penalties under the Wisconsin False Claims for Medical Assistance Law.

**RESPONSE:** The allegations in Paragraph 212 constitute legal conclusions to which no response is required. To the extent a response is required, FDLRC denies the allegations, except that it admits that Relator is proceeding on this basis.

213.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false claims to the Wisconsin State Government for payment or approval.

**RESPONSE:** FDLRC denies the allegations in Paragraph 213.

214.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Wisconsin State Government to approve and pay such false and fraudulent claims.

**RESPONSE:** FDLRC denies the allegations in Paragraph 214.

215.     By virtue of the acts described above, Defendants conspired to defraud the Wisconsin State Government by obtaining payment of false claims for medical assistance.

**RESPONSE:** FDLRC denies the allegations in Paragraph 215.

216.     By virtue of the acts described above, Defendants knowingly and improperly made or used a false statement to avoid an obligation to pay or transmit money or property to the Wisconsin State Government.

**RESPONSE:** FDLRC denies the allegations in Paragraph 216.

217.     The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

**RESPONSE:** FDLRC denies the allegations in Paragraph 217.

218.     By reason of Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**RESPONSE:** FDLRC denies the allegations in Paragraph 218.

219.     Additionally, the Wisconsin State Government is entitled to civil penalties of at least $5,000 for each and every violation alleged herein.

**RESPONSE:** FDLRC denies the allegations in Paragraph 219.

MIL-29184473-1

## AFFIRMATIVE DEFENSES

Without conceding that any of the following necessarily must be pled as an affirmative defense, or that any of the following is not already at issue by virtue of the foregoing denials, and without prejudice to FDLRC's right to plead additional defenses as discovery into the facts of the matter warrant, FDLRC hereby asserts the following defenses:

1.      Counts I-II are barred because they fail to state a claim upon which relief may be granted.

2.      Counts I-II fail because Relator cannot establish that the compensation agreements constitute financial relationships as defined in the Stark Law and regulations.

3.      Counts I-II fail because Relator cannot establish a financial relationship between the FDLRC physicians and Agnesian under the Stark Law and regulations (no direct or indirect financial relationship exists under 42 C.F.R. § 411.354(a)(1)).

4.      Counts I-II fail because the compensation received by the physicians from FDLRC does not vary with, or take into account, the value or volume of hospital or ancillary referrals or other business generated by the physicians for Agnesian.

5.      Counts I-II fail because even if the PSAs did constitute direct or indirect compensation relationships between the FDLRC physicians and Agnesian, the contracts fall within the indirect compensation exception set forth in the Stark Law and regulations.

6.      Counts I-II fail because the amount paid by Agnesian for FDLRC physician services was commercially reasonable and essential to the recruitment and retention of physicians and successful operation of a multi-specialty practice in the communities served by FDLRC and Agnesian, and the aggregate compensation for the services provided under the PSAs from 1996 to the present represent fair market value.

59

7.     Counts I-II are barred because the Relator cannot prove the alleged false claims caused damage to the Government.

8.     Counts I-II fail because even if the compensation arrangements did not fit within an exception, the Relator cannot prove that FDLRC acted with the requisite intent to violate the False Claims Act or related laws.

9.     Counts I-II fail because Relator cannot prove that FDLRC acted with intent to defraud in connection with any claims for services provided to patients referred by FDLRC whose compensation is the subject of this challenge.

10.     Counts I-II are barred by the equitable defenses of waiver, estoppel and ratification.

11.     Counts I-II fail because FDLRC's payments to physicians were compensation pursuant to bona fide employment relationships, and because no part of the compensation arrangements compensated past referrals or induced future referrals from any physician in violation of the Anti-Kickback Statute.

12.     Counts I-II fail to the extent that Relator seeks an award of penalties and treble damages because such an award would be an unconstitutionally excessive fine under the Eighth Amendment to the United States Constitution in that any award would be grossly disproportional to the gravity of Defendants' offense, if any.

### JURY DEMAND

FDLRC, pursuant to Fed. R. Civ. P. 38(b), demands a trial by jury of all issues so triable.

MIL-29184473-1

## PRAYER FOR RELIEF

WHEREFORE, Fond du Lac Regional Clinic, S.C., demands judgment dismissing the Complaint against it on its merits and with prejudice, together with such other and further relief as this Court deems just and appropriate.

Dated this 4th day of April, 2018.

Respectfully submitted,

*/s/ Patrick S. Coffey*
Patrick S. Coffey
Bruce G. Arnold
Andrew A. Jones
Robert M. Romashko
HUSCH BLACKWELL LLP
555 East Wells Street, Suite 1900
Milwaukee, WI 53202
Telephone: (414) 273-2100
Fax: (414) 223-5000
patrick.coffey@huschblackwell.com
bruce.arnold@huschblackwell.com
andrew.jones@huschblackwell.com
robert.romashko@huschblackwell.com

*Attorneys for Fond du Lac Regional Clinic, S.C.*

MIL-29184473-1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 4, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Patrick S. Coffey*